# 23-7640

## United States Court of Appeals
## for the Second Circuit

SEANPAUL REYES,

*Plaintiff-Appellee,*

*against*

CITY OF NEW YORK,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR APPELLANT

HON. SYLVIA O. HINDS-RADIX
*Corporation Counsel*
*of the City of New York*
Attorney for Appellant
100 Church Street
New York, New York 10007
212-356-0846
cmechani@law.nyc.gov

RICHARD DEARING
CLAUDE S. PLATTON
CHASE H. MECHANICK
  *of Counsel*

February 16, 2024

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... iv

PRELIMINARY STATEMENT ................................................................ 1

ISSUES PRESENTED FOR REVIEW ...................................................... 4

STATEMENT OF THE CASE ................................................................... 4

    A. NYPD's recognition of the right to record the police in public places ................................................................................... 4

    B. NYPD's prohibition on filming in precinct lobbies to protect sexual assault survivors, confidential informants, and others ............................................................................................ 6

    C. The State and City Right to Record Acts ................................ 10

    D. Procedural history ...................................................................... 16

        1. Plaintiff's activities as a "First Amendment auditor" .......... 16

        2. Plaintiff's complaint and motion for a preliminary injunction ................................................................................ 17

        3. The district court's order granting a citywide, preliminary injunction of the Facilities Policy under the Right to Record Acts ....................................................... 21

        4. Subsequent procedural history ............................................. 25

STANDARD OF REVIEW AND SUMMARY OF ARGUMENT ............ 25

ARGUMENT ........................................................................................... 30

POINT I ................................................................................................... 30

i

PLAINTIFF HAS NOT SHOWN THAT HE IS LIKELY TO SUFFER IRREPARABLE HARM ................................................. 30

POINT II ....................................................................................... 36

PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS ........................................................................................ 36

A. The district court abused its discretion in exercising supplemental jurisdiction over the Right to Record Act claims. ................................................................................. 36

B. The Facilities Policy does not violate the Right to Record Acts ..................................................................................... 40

1. The City has a common-law proprietary right to control access to, and maintain order within, its property. ............. 44

2. The Right to Record Acts do not abrogate the City's common-law proprietary rights. ........................................... 50

3. The district court's reading would lead to hard questions about individuals' "rights" to record in courthouses, prisons, and non-public areas of police precincts. ....................................................................... 52

4. Legislative history confirms that the Right to Record Acts do not enshrine broader rights than the First Amendment inside government buildings ............................. 55

POINT III ..................................................................................... 61

THE BALANCE OF EQUITIES AND PUBLIC INTEREST OVERWHELMINGLY FAVOR THE CITY ................................. 61

POINT IV ..................................................................................... 65

THE DISTRICT COURT'S INJUNCTION WAS OVERBROAD ................................................................................ 65

CONCLUSION ......................................................................... 68

CERTIFICATE OF COMPLIANCE ...................................................... 69

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ACLU of Ill. v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012) .................................................... 12, 59, 62

*Adamides v. Warren,*
  No. 21-CV-6613, 2022 U.S. Dist. LEXIS 125758
  (W.D.N.Y. Jul. 15, 2022) ....................................................... 40

*Alemite Mfg. Corp. v. Staff,*
  42 F.2d 832 (2d Cir. 1930) ...................................................... 68

*Allen v. Adami,*
  39 N.Y.2d 275 (1976) ............................................................. 46

*Amoco Prod. Co. v. Vill. of Gambell,*
  480 U.S. 531 (1987) ............................................................... 33, 34

*Bacon v. Phelps,*
  961 F.3d 533 (2d Cir. 2020) ................................................... 60

*Barber v. Governor of Ala.,*
  73 F.4th 1306 (11th Cir. 2023) ............................................. 18

*Bd. of Higher Ed. v. Students for a Democratic Soc'y,*
  60 Misc. 2d 114 (Sup. Ct., Queens Cty. 1969) ..................... 49

*Boonville v. Maltbie,*
  272 N.Y. 40 (1936) ................................................................ 46

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ............................................................... 68

*California v. Texas,*
  141 S. Ct. 2104 (2021) ........................................................... 67

iv

*Carver v. Nassau Cty. Interim Fin. Auth.*,
730 F.3d 150 (2d Cir. 2013) ........................................................ 39, 41

*Clackamas Gastroenterology Assocs., P.C. v. Wells*,
538 U.S. 440 (2003) ........................................................................ 53

*Cohen v. Postal Holdings, LLC*,
873 F.3d 394 (2d Cir. 2017) .............................................................. 38

*Conn. State Police Union v. Rovella*,
36 F.4th 54 (2d Cir. 2022) ................................................................ 27

*Dep't of Homeland Sec. v. N.Y.*,
140 S. Ct. 599 (2020) ....................................................................... 68

*eBay v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ................................................................... 65, 66

*Ellis v. Allen*,
4 A.D.2d 343 (3d Dep't 1957) .......................................................... 49

*Expedia, Inc. v. United Airlines*,
No. 19-cv-1066, 2019 U.S. Dist. LEXIS 59037
(S.D.N.Y. Apr. 5, 2019) ................................................................... 35

*Fay v. S. Colonie Cent. Sch. Dist.*,
802 F.2d 21 (2d Cir. 1986) .............................................................. 39

*Fed. Ins. Co. v. Metro. Transp. Auth.*,
No. 17 Civ. 3425, 2017 U.S. Dist. LEXIS 106134
(S.D.N.Y. Jul. 10, 2017) ................................................................... 35

*Fields v. City of Phila.*,
862 F.3d 353 (3d Cir. 2017) ........................................................ 59, 62

*Finn v. Barney*,
471 F. App'x 30 (2d Cir. Mar. 27, 2012) .......................................... 18

*Fish v. Kobach*,
840 F.3d 710 (10th Cir. 2016) ......................................................... 34

*Flynn v. City of N.Y.*,
  258 A.D.2d 129 (1st Dep't 1999) ........................................... 6

*Force v. Facebook, Inc.*,
  934 F.3d 53 (2d Cir. 2019) ................................................... 18

*Fordyce v. City of Seattle*,
  55 F.3d 436 (9th Cir. 1995) ................................... 12, 59, 62

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ......................................................... 67

*Glik v. Cunniffe*,
  655 F.3d 78 (1st Cir. 2011) ................................... 12, 59, 62

*Gorman v. Town of Huntington*,
  12 N.Y.3d 275 (2009) .......................................................... 46

*Griffin v. HM Florida-ORL, LLC*,
  144 S. Ct. 1 (2023) ............................................................... 68

*Guarniere v. City of N.Y.*,
  No. 21cv1739, 2023 U.S. Dist. LEXIS 40936
  (S.D.N.Y. Mar. 10, 2023) .................................................... 40

*Hall v. Louis Weber Bldg. Co.*,
  36 Misc. 551 (App. Term 1901) ......................................... 47

*Hechter v. New York Life Ins. Co.*,
  46 N.Y.2d 34 (1978) ............................................... 29, 46, 51

*Heggs v. City of N.Y.*,
  No. 17-CV-3234, 2023 U.S. Dist. LEXIS 149647
  (E.D.N.Y. Aug. 24, 2023) .................................................... 40

*Holt v. Continental Grp.*,
  708 F.2d 87 (2d Cir. 1983) ......................................... 28, 34

*Hospitality Grp. of Am. v. Terrace on the Park, Inc.*,
  No. 92 Civ 6814, 1993 U.S. Dist. LEXIS 5163
  (S.D.N.Y. Apr. 15, 1993) .............................................. 47, 48

*Huntington v. Marsh*,
884 F.2d 648 (2d Cir. 1989) ............................................................. 33

*Int'l Soc'y for Krishna Consciousness v. Lee*,
505 U.S. 672 (1992) ................................................................... 48, 49

*JTH Tax, LLC v. Agnant*,
62 F.4th 658 (2d Cir. 2023) ....................................................... 27, 32

*Kiobel v. Royal Dutch Petro. Co.*,
569 U.S. 108 (2013) ......................................................................... 52

*L.W. v. Skrmetti*,
73 F.4th 408 (6th Cir. 2023) ........................................................... 67

*Local 553, Tr. Workers Union v. Eastern Air Lines, Inc.*,
695 F.2d 668 (2d Cir. 1982) ........................................................... 34

*Lofaro v. City of New Rochelle*,
No. 53694/2001, 2013 N.Y. Misc. LEXIS 5132
(Sup. Ct., Westchester Cty. Oct. 7, 2013) ........................................ 46

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) ......................................................................... 47

*Lubonty v. U.S. Bank Nat'l Ass'n*,
34 N.Y.3d 250 (2019) ...................................................................... 54

*Metro Life Ins. Co. v. Bucsek*,
919 F.3d 184 (2d Cir. 2019) ........................................................... 27

*Morrison v. Nat'l Austl. Bank Ltd.*,
561 U.S. 247 (2010) ......................................................................... 52

*Munaf v. Geren*,
553 U.S. 674 (2008) ......................................................................... 27

*Nat. Res. Def. Council v. Texas*,
906 F.2d 934 (3d Cir. 1990) ........................................................... 34

*Nat'l Ass'n of Mfrs. v. Taylor*,
582 F.3d 1 (D.C. Cir. 2009) ........................................................... 36

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
  886 F.3d 803 (9th Cir. 2018) ...................................................... 35, 36

*People v. Alderson,*
  144 Misc.2d 133 (Crim. Ct., N.Y. Cty. 1989) ................................... 49

*People v. Ashdown,*
  12 Misc. 3d 836 (Sup. Ct., Rensselaer Cty. 2006) ............................ 56

*People v. Barnes,*
  26 N.Y.3d 986 (2015) ...................................................................... 49

*People v. Graves,*
  76 N.Y.2d 16 (1990) ....................................................................... 47

*People v. Martinez,*
  43 Misc. 2d 94 (Crim. Ct., N.Y. Cty. 1964) .................................. 50, 56

*People v. Munroe,*
  18 Misc. 3d 9 (App. Term, 2d Dep't 2007) ...................................... 49

*People v. Pabon,*
  28 N.Y.3d 147 (2016) ...................................................................... 54

*People v. Reape,*
  22 Misc. 3d 615 (Sup. Ct., Kings Cty. 2008) ........................ 49, 50, 51

*People v. Roberts,*
  31 N.Y.3d 406 (2018) ...................................................................... 56

*People v. Wallace,*
  31 N.Y.3d 503 (2018) ...................................................................... 56

*People v. Young Kahng,*
  52 Misc. 3d 1 (App. Term, 2d Dep't 2016) ...................................... 49

*Plymouth Venture Partners, II, L.P. v. GTR Source, LLC,*
  37 N.Y.3d 591 (2021) ...................................................................... 45

*Register.com, Inc. v. Verio, Inc.,*
  356 F.3d 393 (2d Cir. 2004) ............................................................ 34

viii

*Matter of Robert E. Havell Revocable Trust v. Zoning Bd. of Appeals of Vill. of Monroe*,
  127 A.D.3d 1095 (2d Dep't 2015) ........................................ 46

*Rodriguez v. KGA Inc.*,
  155 A.D.3d 452 (1st Dep't 2017) ........................................ 52

*Rogers v. N.Y.C. Tr. Auth.*,
  89 N.Y.2d 692 (1997) ................................................ 48, 49

*Ruckelshaus v. Monsanto Co.*,
  463 U.S. 1315 (1983) ................................................. 36

*S.H. v. Diocese of Brooklyn*,
  205 A.D.3d at 187 (2d Dep't 2022) ..................................... 52

*Seabrook v. Jacobson*,
  153 F.3d 70 (2d Cir. 1998) ........................................... 41

*Smith v. City of Cumming*
  No. 1:97-CV-1753, 1999 U.S. Dist. LEXIS 23875
  (N.D. Ga. Jan. 11, 1999), ............................................ 62

*Smith v. City of Cumming*,
  212 F.3d 1332 (11th Cir. 2000) ....................................... 59

*Stewart v. U.S. I.N.S.*,
  762 F.2d 193 (2d Cir. 1985) ....................................... 28, 33

*Thomson Indus., Inc. v. Port Washington North*,
  27 N.Y.2d 537 (1970) ................................................. 46

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) ............................................... 68

*Turner v. Lieutenant Driver*,
  848 F.3d 678 (5th Cir. 2017) ..................................... 11, 59, 62

*United States v. Texas*,
  143 S. Ct. 1964 (2023) ............................................ 66, 68

ix

*Vucetovic v. Epsom Downs, Inc.*,
    10 N.Y.3d 517 (2008) ........................................................ 46

*We the Patriots USA, Inc. v. Hochul*,
    17 F.4th 295 (2d Cir. 2021) ............................................. 27

*Wheelock v. Noonan*,
    108 N.Y. 179 (1888) ........................................................ 47

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008) ....................................................... 35, 36

*Young v. N.Y.C. Tr. Auth.*,
    903 F.2d 146 (2d Cir. 1990) ..................................... 38, 39, 40

**Constitutions**

U.S. Const. art. III ................................................... 3, 31, 67

**Statutes and Local Laws**

28 U.S.C. § 1367 .......................................................... 38, 39, 41

42 U.S.C. § 1983 ................................................................ 60

N.Y. Civ. Rights L. § 52 .................................................... 56

N.Y. Civ. Rights L. § 79-p ........................................... *passim*

N.Y. Crim. Proc. L. § 2.10 ............................................... 55

N.Y. Exec. L. § 292 ........................................................... 51

N.Y. Exec. L. § 296 ........................................................... 51

N.Y. Penal Law § 140.00 ............................................ 44, 48

N.Y. Penal Law § 140.05 .................................................. 44

N.Y.C. Admin. Code § 14-189 ..................................... *passim*

N.Y.C. Charter § 1043 ....................................................... 19

N.Y.C. Human Rights L. § 8-102 ............................................................ 52

N.Y.C. Human Rights L. § 8-107 ............................................................ 52

**Rules**

22 N.Y.C.R.R. § 131.1 .............................................................................. 65

2d Cir. Loc. R. App'x Pt. B .................................................................... 64

Fed. R. Crim. P. 53 .................................................................................. 65

**Other Authorities**

Ashley Southall, *Video of Man Berating Officer Opens Debate Over Recording in Police Stations*, N.Y. Times (Aug. 21, 2018) ............................................................................... 58

Joint Counterterrorism Assessment Team, *Emerging Technologies May Heighten Terrorist Threats* (Oct. 14, 2022) ..................................................................................... 11

N.Y. Assembly Bill 2015-A10387A ................................................... 14, 57

N.Y. Assembly Bill 2017-A2448 .............................................................. 14

N.Y. Senate Bill 2015-S8074 ............................................................. 14, 57

N.Y. Senate Bill 2017-S2876 ................................................................... 14

N.Y. State Senate Introducer's Mem. In Support of S3253A ................ 14

N.Y. State Unified Court System, *Types of Visitation* ............................. 9

N.Y.C. Council, Comm. on Pub. Safety, Comm. Rep. of the Justice Div. (Jun. 9, 2020) ................................................................. 13, 60

NYPD, *About NYPD* ............................................................................. 19, 67

NYPD, *Resources & Services—Orders of Protection* ................................ 8

NYPD Patrol Guide Policy No. 212-123 (May 4, 2023) ............................ 9

xi

Restatement 2d of Torts § 168 ................................................................. 47

Restatement 2d of Torts § 171 ................................................................. 47

Will Sommer, *The Insane New Path to YouTube Fame: Taunt Cops and Film It*, The Daily Beast (Jan. 24, 2019) ............................ 17

## PRELIMINARY STATEMENT

NYPD precincts are designed to be secure spaces. Arrestees are transported there. Officers carry and store weapons there. Confidential informants, undercover officers, and witnesses to gang violence pass through there—placing their trust in the NYPD to keep their identities anonymous. And victims of sexual assault and domestic violence come to report heinous crimes, potentially risking retaliation from their partners. For these reasons and more, NYPD does not allow visitors to film inside the precinct. Otherwise, anyone with a recording device could capture sensitive information and conversations and post them online, compromising both the facility's security and individuals' privacy.

Plaintiff-appellee SeanPaul Reyes, a YouTube personality and self-described independent journalist, challenged the no-recording policy on First Amendment and state-law statutory grounds. While holding that Reyes lacked a likelihood of success on his sole federal claim under the First Amendment, the U.S. District Court for the Southern District of New York (Clarke, J.) granted a sweeping, citywide preliminary injunction of the policy's enforcement on statutory grounds. On this interlocutory appeal, the Court should reverse.

As an initial matter, Reyes did not demonstrate that he will be irreparably harmed without a preliminary injunction. Below, he relied on a presumption of irreparable harm for constitutional violations, but that presumption does not apply to alleged violations of a statute. He failed to otherwise explain how a delay in being able to film inside police precincts would harm him—let alone irreparably—or why monetary damages would be inadequate to make him whole. And any supposed harm to third parties is both unsubstantiated and irrelevant under the irreparable harm prong.

Further, plaintiff is unlikely to prevail in this action. The district court correctly held that plaintiff lacks a likelihood of success on his principal claim that the no-recording policy violates the First Amendment. But it erred when it embraced plaintiff's alternative claim that the policy violates the State and City Right to Record Acts. As an initial point, the court should have declined supplemental jurisdiction over these claims, rather than wade into novel areas of state law with sensitive policy implications where no federal claim was likely viable.

Moreover, the district court's analysis of these newly minted statutes was flawed. To be sure, the Right to Record Acts codify a right

to record law enforcement activity in public. But those laws do not prohibit the government or its agencies, like the NYPD, from establishing rules governing conduct within government facilities. And specifically, the NYPD may prohibit civilians from recording to ensure that its precincts remain safe, secure spaces. New York law requires a clear statement of legislative intent to override common-law property principles, and nothing in the text or legislative history of the Right to Record Acts indicates such an intention here.

The district court also erred in other respects. Contrary to its holding, the balance of equities and public interest factors weigh against injunctive relief. If the NYPD's policy were enjoined, any member of the public could record rape victims, juveniles, cooperating witnesses, or confidential informants who are present in or visible from a precinct lobby. Moreover, they could document precinct security measures and post the recordings on the internet for the world to see—indeed, Reyes himself has posted a precinct video to his social media channel that captures an officer entering a security code. And at minimum, even if a preliminary injunction of some kind were warranted (which it is not), the court's universal, citywide injunction would be overbroad.

## ISSUES PRESENTED FOR REVIEW

1. Whether plaintiff failed to demonstrate that he is likely to be irreparably harmed without a preliminary injunction.

2. Whether plaintiff is unlikely to prevail in his claims under the State and City Right to Record Acts.

3. Whether the balance of equities and public interest factors also weigh against preliminary injunctive relief.

4. Whether the district court's injunction, prohibiting the NYPD from enforcing the Facilities Policy against any person and throughout the City, was overbroad.

## STATEMENT OF THE CASE

### A. NYPD's recognition of the right to record the police in public places

The smartphone era has seen an explosion of civilian recordings of police activity. In 2016, an individual who alleged that he was arrested after filming NYPD officers on a Manhattan street brought a lawsuit against the City of New York. *See* Complaint in *An v. City of N.Y.*, Case No. 1:16-cv-05381-LGS, ECF No. 1 (S.D.N.Y. filed Jul. 6, 2016). As part of its settlement of those claims, the City agreed to revise NYPD's Patrol

4

Guide[1] to offer robust protections for all New Yorkers who wish to similarly record the police in public spaces (Joint Appendix ("A") 21, 40-41, 46-47).

Specifically, in June 2018, the NYPD issued Patrol Guide Procedure No. 203-29 (A46-47) ("PG 203-29"),[2] which affirms that "[i]ndividuals have a right to lawfully observe and/or record police activity including, but not limited to, detentions, searches, arrests, or uses of force" (A46). An individual may exercise this right on public streets, sidewalks, and parks; on the individual's own property; and in privately owned lobbies, workplaces, or other buildings where the individual has the legal right to be present (*id.*). Officers may not threaten, intimidate, or discourage such an individual from exercising these rights (*id.*). Nor may officers intentionally obstruct the recording

---

[1] The Patrol Guide is a compendium of internal directives and serves as "the vehicle by which the Police Department regulates itself." *Flynn v. City of N.Y.*, 258 A.D.2d 129, 138 (1st Dep't 1999).

[2] As part of a migration of certain Patrol Guide policies to the NYPD's Administrative Guide, PG 203-29 was recodified, with text unchanged, as Administrative Guide Procedure No. 304-21 (A50-51). *See* NYPD, Department Manual Timeline 18 (updated Jan. 3, 2024), available at https://perma.cc/M34C-RHVZ (accessed Feb. 16, 2024). References herein to "PG 203-29" include its recodification in the Administrative Guide.

5

without a legitimate law enforcement reason or order the individual to delete the recording (*id.*).

At the same time, PG 203-29 recognizes that the right to record the police "can be limited" (*id.*). For example, recordings can be restricted to protect "the safety of officers or other members of the public" (*id.*). The police may also limit the places where observers can stand and record. For example, officers may enforce police lines at demonstrations, special events, or for crowd control (*id.*). Plaintiff does not contend that any of those limitations are unlawful.

## B. NYPD's prohibition on filming in precinct lobbies to protect sexual assault survivors, confidential informants, and others

The provision of PG 203-29 challenged here is a section specifying that civilians "are not allowed to photograph and/or record police activity within Department facilities" (A47) (PG 203-27(7) (the "Facilities Policy")).

If an officer observes an individual photographing or recording inside of an NYPD facility—for instance, in a police precinct—the officer may take enforcement action only by following a strict, three-step procedure. First, the officer "may" order the individual to stop recording

6

(*id.*). Next, if the individual refuses an order to stop recording, the officer should order the individual to leave (*id.*). Finally, if the individual refuses this order to leave, the officer "may" take appropriate action, such as arresting the individual for trespass (*id.*).

The Facilities Policy serves civilians' heightened privacy expectations in NYPD precinct buildings. The lobby is typically where civilians report crimes and communicate with law enforcement (A96, 134). In some lobbies, including the one plaintiff visited here, civilians will approach a gate or window to speak with a member of the Department (A133). There may also be a central hub or desk area where information is exchanged (A135-36, 138-39). In some precincts, these areas are not closed off with walls, leaving large segments of the precinct open to recording (A79). Many of those who come to the precinct lobby to speak to officers are victims of, or witnesses to, sexual assault or domestic violence (A96, 99, 134, 138-39). Individuals might also come to a precinct for assistance serving papers for a family court order of protection against a partner, or to report violations of an order of protection.[3] Just as

---

[3] *See* NYPD, *Resources & Services—Orders of Protection*, available at https://perma.cc/HNS8-TPC2 (accessed Feb. 16, 2024).

7

uniformed officers must deactivate their body worn cameras during encounters with sexual assault and domestic violence victims (A99, 139); *see* NYPD Patrol Guide Policy No. 212-123 § 11 (May 4, 2023),[4] the Facilities Policy ensures that third parties are not able to record these conversations, which can amount to a serious invasion of privacy for survivors and deter reporting of these types of offenses (A79, 99).

The Facilities Policy protects essential privacy interests in other ways too. Confidential informants, individuals wishing to sign up as confidential informants, undercover officers, juveniles, and individuals reporting gang violence may all be present in a precinct lobby (A79, 96, 99, 134). Additionally, precincts serve as safe, neutral locations where a court may order a parent to drop off a child for visitation by the other parent.[5] The Facilities Policy ensures that the privacy and anonymity of these individuals is not violated, especially where a video can be posted online for anyone to access (A79, 99).

---

[4] Available at https://perma.cc/E6Y9-HGFX (accessed Feb. 16, 2024).

[5] *See* New York State Unified Court System, *Types of Visitation*, available at https://perma.cc/93FW-T3SR (accessed Feb. 16, 2024).

In addition to all this, police precincts are also sensitive security sites where unrestricted filming could endanger officers or interfere with operations. A person recording in a lobby can memorialize the locations of firearms (A137) as well as vehicle keys, radios, computer terminals, electrical breakers, and gas connections (A79). In some precincts, people in the lobby may also be able to observe the muster room and capture sensitive information, such as the location where a search warrant will be executed (A97, 136). Videos in the lobby can also expose the locations of security cameras (A140).

Even if a video is recorded for innocent reasons, once it is posted on the internet, individuals who mean to do harm can access it to learn about and exploit any security vulnerabilities. They can watch and re-watch the video, scrutinize it, freeze frames, and even technologically enhance it (A101). NYPD must take these concerns seriously: between January 1, 2022 and September 1, 2023, there were 27 bomb threats against NYPD precincts (A80). Emerging technologies heighten these risks. The United States Joint Counterterrorism Assessment Team (JCAT) recently described how, "[w]ith sufficient reconnaissance and information gathering, terrorists could create virtual environments with

representations of potential targets and other physical structures" and use augmented reality to rehearse an attack. *See* JCAT, *Emerging Technologies May Heighten Terrorist Threats* 7-8 (Oct. 14, 2022).[6]

### C. The State and City Right to Record Acts

The May 25, 2020 murder of George Floyd—which a bystander filmed on her cellphone—intensified important conversations about policing. These conversations reached the New York State Legislature and New York City Council, where lawmakers focused on, among other things, the right of civilians to record police officers when they make arrests or use force in public, especially during the summer 2020 protests when some officers were filmed responding to demonstrators in ways that attracted criticism.

Before 2020, several federal circuits had already held that the First Amendment protects civilians' right to record law enforcement in quintessentially public spaces. *See, e.g., Turner v. Lieutenant Driver*, 848

---

[6] Available at
https://www.dni.gov/files/NCTC/documents/jcat/firstresponderstoolbox/134s_-
_First_Responders_Toolbox_-
_Emerging_Technologies_May_Heighten_Terrorist_Threats.pdf (accessed Feb. 16,
2024).

F.3d 678, 690 (5th Cir. 2017); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 597 (7th Cir. 2012); *Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995). And although the Second Circuit had not yet joined these others, the NYPD internally prohibited its officers from interfering with lawful recordings in public, as noted earlier (A46-47).

Nevertheless, after Floyd's murder and the ensuing demonstrations, some state lawmakers perceived that individual officers were not honoring this right. Several assemblymembers alleged that officers had seized or destroyed recording devices, contrary to NYPD policy. *See* June 8, 2020 Assembly Debate Transcript for L. 2020, ch. 100 (Dkt. No. 8.2, PDF pp. 13-49) ("Assembly Tr.") 107, 116, 120-21. They observed that Floyd's murder would not have been made visible to the public had it not been recorded by a civilian on a public street. *See* Assembly Tr. 114, 122, 128, 131.

Similarly, in the City Council, a Committee on Public Safety report cited allegations that some officers had interfered in various ways with civilians' ability to record, including by ordering them to delete footage. *See* Council of the City of N.Y., Comm. on Pub. Safety, Comm. Rep. of the

Justice Div. (Jun. 9, 2020) (Dkt. No. 8.2, PDF pp. 51-78) ("NYCC Rep.")
6. City Councilmember Jumaane Williams lamented that, although the
"law allow[ed] people to record in a public space ... we have seen officers
inconsistently respond to recordings of their actions." Transcript of the
Minutes of the Comm. on Pub. Safety of the N.Y.C. Council (June 9, 2020)
(Dkt. No. 8.2, PDF pp. 80-99) ("2020 NYCC Tr.") 36.[7]

 To clarify that individuals have a general right to record police
officers, and to enable such individuals to pursue a private right of action
if this right is denied, the State Legislature in June 2020 passed the New
Yorker's Right to Monitor Act, also known as the State Right to Record
Act (SRTRA), L. 2020, ch. 100 (codified at N.Y. Civ. Rights L. § 79-p). The
SRTRA was largely identical to earlier versions of the same bill that had
been introduced (but were not passed) in 2016 and 2017. *See* Senate Bill

---

[7] Full transcript available for download at
https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=3371660&GUID=CCE66
ABB-0E5C-4FB0-A21F-F9CB0BE4D6EA&Options=ID%7CText%7C&Search=
(accessed Feb. 16, 2024).

2015-S8074;[8] Assembly Bill 2015-A10387A;[9] Senate Bill 2017-S2876;[10] Assembly Bill 2017-A2448.[11] The sponsor's memorandum indicated that the bill codified a constitutional right to record articulated by "several Federal Circuit Courts." New York State Senate Introducer's Mem. In Support of S3253A (Dkt. No. 8.2, PDF p. 108) ("Senate Sponsor's Mem."). In the Assembly, one member explained that the SRTRA "[t]ak[es] something that we already know is a right and mak[es] it statutory so that there's a civil right of action …." Assembly Tr. 108.

Also in June 2020, the City Council passed the similarly worded City Right to Record Act (CRTRA), L.L. 2020/067 (codified at N.Y.C. Admin. Code § 14-189). The CRTRA was originally introduced two years earlier by Councilmember Williams. *See* Minutes of the City Council

---

[8] Available at https://www.nysenate.gov/legislation/bills/2015/2015-s8074 (accessed Feb. 16, 2024).

[9] Available at https://www.nysenate.gov/legislation/bills/2015/2015-a10387a (accessed Feb. 16, 2024).

[10] Available at https://www.nysenate.gov/legislation/bills/2017/S2876 (accessed Feb. 16, 2024).

[11] Available at https://www.nysenate.gov/legislation/bills/2017/A2448 (accessed Feb. 16, 2024).

Stated Meeting ("2018 NYCC Minutes") 1093-94 (Mar. 7, 2018).[12] When introducing that bill, Councilmember Williams explained: "It does not create any new rights. It just gives a private right because if you had to push forward on your right with the constitution, it is much more onerous …." Transcript of the Minutes of the City Council Stated Meeting (Mar. 7, 2018) ("2018 NYCC Tr.") 42.[13]

Though there are slight textual variations between the SRTRA and CRTRA (together, the "Acts"), they largely overlap. First, each Act contains a short clause enshrining a substantive right to record law enforcement activity. *See* Civ. Rights L. § 79-p(2) ("A person … has the right to record law enforcement activity …."); Admin. Code § 14-189(b) ("A person may record police activities …."). The Acts define "law enforcement activity" (under the SRTRA) and "police activities" (under the CRTRA) to mean "any activity by an officer acting under the color of

---

[12] Available for download at
https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=3371660&GUID=CCE66
ABB-0E5C-4FB0-A21F-F9CB0BE4D6EA&Options=ID%7CText%7C&Search=
(accessed Feb. 16, 2024).

[13] Available for download at
https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=3371660&GUID=CCE66
ABB-0E5C-4FB0-A21F-F9CB0BE4D6EA&Options=ID%7CText%7C&Search=
(accessed Feb. 16, 2024).

law." Civ. Rights L. § 79-p(1)(b); Admin. Code § 14-189(a). "Officer" means any police officer or peace officer, Civ. Rights L. § 79-p(1)(a); Admin. Code § 14-189(a), and the SRTRA further defines "officer" to include "security officer[s], security guard[s] or similar official[s] who [are] engaged in a law enforcement activity," Civ. Rights L. § 79-p(1)(a).

The CRTRA contains a saving clause providing that nothing therein shall (i) permit a person to physically interfere with law enforcement, (ii) prohibit an officer from seizing a recording device as authorized by law, or (iii) "prohibit any officer from enforcing any other provision of law." Admin. Code § 14-189(b). A saving clause in the SRTRA provides that nothing therein shall permit a person to physically interfere with law enforcement or commit the offense of obstructing governmental administration. *See* Civ. Rights L. § 79-p(1)(a). These clauses carefully delineate certain *conduct* (either by the officer or the person recording) that falls outside the Acts' bounds, but there are no comparable provisions of the Acts circumscribing the *locations* where law enforcement activity may be recorded.

After describing this substantive right to record, the Acts create a private right of action where an "officer … interfere[s]" with this right.

15

Civ. Rights L. § 79-p(3); Admin. Code § 14-189(c). Under both Acts, a prevailing plaintiff may obtain damages, declaratory relief, injunctive relief, attorney's fees, expert fees, and other "appropriate" relief. Civ. Rights L. § 79-p(3)(c)-(d); Admin. Code § 14-189(c)(3)-(4).

### D.  Procedural history

#### 1.  Plaintiff's activities as a "First Amendment auditor"

Plaintiff is a social media personality and self-identified member of a community of "First Amendment Auditors" (A123). *See generally* Will Sommer, *The Insane New Path to YouTube Fame: Taunt Cops and Film It*, The Daily Beast (Jan. 24, 2019).[14] Though he describes himself as an independent journalist (A15), his stories are almost invariably about himself. Specifically, he records himself entering government buildings or property; these videos also typically also include reactions from public officials or security officers informing him that he does not have permission to record. Plaintiff then posts edited videos of these

---

[14] Available at https://perma.cc/JD7H-UGP3 (accessed Feb. 16, 2024)

encounters on his YouTube channel, "Long Island Audit."[15]  In at least one video, plaintiff explains that he purposefully tries to get law enforcement to threaten to arrest him so that he can manufacture "standing" to bring lawsuits.[16] Plaintiff pointed to this very case—specifically, the preliminary injunction below—as an example of that strategy paying off.[17]

### 2. Plaintiff's complaint and motion for a preliminary injunction

Plaintiff commenced this lawsuit on July 24, 2023 (A15). His complaint[18] states that his "journalistic obligations require him to visit publicly accessible spaces—including NYPD precincts—and record his encounters with public officials" (A30). He claims that it is unlawful for

---

[15] Available at https://www.youtube.com/@LongIslandAudit (accessed Feb. 16, 2024). Plaintiff's complaint extensively relies upon the contents of his YouTube channel and, thus, incorporates the contents of the channel by reference (A15, 17, 18, 26-27). *See Force v. Facebook, Inc.*, 934 F.3d 53, 59 n.5 (2d Cir. 2019); *Finn v. Barney*, 471 F. App'x 30, 32 n.1 (2d Cir. Mar. 27, 2012) (summary order).

[16] https://www.youtube.com/watch?v=2Za3XaxGh7k&t=600s at 10:00-11:16 (accessed Feb. 16, 2024).

[17] https://www.youtube.com/watch?v=2Za3XaxGh7k&t=660s at 11:00-11:09 (accessed Feb. 16, 2024).

[18] Though plaintiff filed an amended complaint after this appeal was taken (A12), only his initial complaint is before this Court. The district court's order cannot be affirmed based on new allegations in the amended complaint. *See Barber v. Governor of Ala.*, 73 F.4th 1306, 1316 n.16 (11th Cir. 2023).

NYPD to prevent him from doing so, invoking (1) the First Amendment, (2) the State and City Right to Record Acts, and (3) the rulemaking provisions of the City Administrative Procedure Act (CAPA), N.Y.C. Charter § 1043 (A30-35). He requests a permanent injunction effectively barring the NYPD from enforcing the Facilities Policy in all of its 77 precinct building lobbies citywide (A36).[19] The complaint recounts two prior occasions in which plaintiff was arrested after filming in violation of the policy (A26-29) but seeks no backwards-looking relief (such as damages) to redress harms flowing from these past arrests.

Simultaneously with the filing of his initial complaint, plaintiff moved for a preliminary injunction of the Facilities Policy (A4, 82). His memorandum of law in support of that motion focused almost entirely on his First Amendment claim, devoting just a page to his alternative argument that the policy contravenes the Right to Record Acts. *See Reyes v. City of N.Y.*, Case No. 1:23-cv-06369-JGLC, ECF No. 7, at 18-19 (Jul. 25, 2023). As to irreparable harm, plaintiff submitted a declaration stating that he "intend[s] to exercise [his] rights to make recordings" and

---

[19] NYPD, *About NYPD*, available at https://perma.cc/JXC8-DY5G (accessed Feb. 16, 2024).

that he "cannot continue reporting without recording his interactions with officers, including those that take place in police precinct lobbies" (A64). Plaintiff did not say when exactly he planned to record in NYPD precinct, what he hoped to film, or why he could not wait until a final judgment to do so. Instead, his memorandum relied on a presumption of irreparable harm for constitutional violations, predicated on the theory that the Facilities Policy violates the First Amendment. *See Reyes*, No. 1:23-cv-06369-JGLC, ECF No. 7, at 20-21 (S.D.N.Y. Jul. 24, 2023).

The district court held an evidentiary hearing on September 28, 2023 (A110). NYPD captain Joseph Leone, the executive officer of the 75th Precinct, testified for the City (A131). Captain Leone's unrefuted testimony established that victims of sexual assault and domestic violence—as well as confidential informants and juveniles—may come into an NYPD lobby to speak with an officer or report a crime (A134, 138-39). His testimony also established that a person may be able to record a significant amount of sensitive security information from the lobby, such as the muster room and the locations of weapons and security cameras (A133, 136-37, 140). The court vividly observed how this could be done by reviewing a video that plaintiff himself uploaded to his YouTube channel,

19

where—in violation of the Facilities Policy—he filmed the lobby of the 61st Precinct and captured a security code entered by an officer to enter a restricted area (A143).[20]

The only other witness to testify was plaintiff himself. His testimony did not address any of these privacy or security considerations. He claimed that he is investigating the NYPD and that he receives tips about police misconduct "on a weekly basis" (A122), but he did not say that any of the alleged misconduct occurred within police precincts. He claimed that "people" want him to record them filing complaints, but did not say why or what those recordings aim to capture, except that they would generate content for his social media channels (*id.*). Plaintiff did not explain why his filming of other people's complaints could not wait until the conclusion of his lawsuit.

---

[20] The City moved herewith to supplement the record to incorporate the exhibits admitted into evidence at the September 28, 2023 hearing, which include plaintiff's recording at the 61st precinct (A123).

### 3. The district court's order granting a citywide preliminary injunction of the Facilities Policy under the Right to Record Acts

On November 2, 2023, the district court granted plaintiff's motion for a preliminary injunction (A82-108). The district court found that plaintiff was not likely to succeed on his First Amendment claim, but exercised supplemental jurisdiction over plaintiff's Right to Record Act claims and held that he was likely to succeed on those claims. The court declined to address plaintiff's alternative CAPA argument.

With respect to plaintiff's First Amendment claim, the district court straightforwardly applied the public forum doctrine under the Supreme Court's and this Court's precedent (A93-98). The court rejected plaintiff's argument that precinct lobbies are designated public forums, as plaintiff produced "no evidence that the government intended to open up police precinct lobbies for expressive activities, like peaceful protesting and leafleting, beyond being open to members of the public seeking assistance from the police" (A97). Rather, analogizing precinct lobbies to "waiting rooms at a city agency" and similar fora, the court concluded that the lobbies were nonpublic or, at most, limited public forums (A96-97 (citing, inter alia, *Make The Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 145-

21

46 (2d Cir. 2004) (holding Job Center waiting rooms were nonpublic forums))).

Accordingly, the court analyzed whether the Facilities Policy, as applied to precinct lobbies, was reasonable and viewpoint neutral (A98). There was no dispute that the policy was viewpoint neutral, and the court concluded that plaintiff had failed to prove that the policy was not reasonable (A101-02). The court noted that survivors of sexual assault and domestic violence "may be less willing to go to a precinct to make a report if they know that they may be captured on camera doing so," and that allowing confidential informants to be recorded could expose them to reprisals (A99). The court further credited the City's concerns about individuals capturing sensitive information, such as "the area[s] where firearms are secured" (A101). Plaintiff attempted to downplay these risks by arguing that individuals in precinct lobbies can see all of these things even if they are not recording (*id.*). But the district court rejected this argument out of hand. It emphasized that recordings pose special risks because they are permanent, can capture sights and sounds that the human eye and ear cannot, and are easily disseminated over the internet (*id.*).

22

Notwithstanding all of this, the court granted a preliminary injunction on the basis of its determination that the Facilities Policy likely violated the Right to Record Acts. The court construed the Acts to "go beyond the protections of the First Amendment" (A105). Because the Acts did not affirmatively "carve out police precinct lobbies as places where individuals are not allowed to record," the court asserted that the right to record unambiguously extended to these places (A104). The court purported to buttress this conclusion by relying on an NYPD Legal Bureau Bulletin, issued shortly after the Right to Record Acts were passed, which stated that individuals had the right to record on "private property such as a … lobby" (A104-05; *see* A71). But the court ignored language in this document clarifying that "[t]he new laws do not change the [Police] Department's prohibition on recording inside its facilities (A73).

The court also found that plaintiff carried his burden with respect to the remaining preliminary injunction factors. As to irreparable harm, the court found that the Facilities Policy was preventing plaintiff from "provid[ing] a window of transparency into police officers exercising their duties" and that monetary damages would be inadequate "[i]n light of the

ongoing nature of this harm" (A106). But the court did not explain how plaintiff's activities promote transparency in government or why he would be injured by not being able to record before there is a final judgment. As to the balance of equities and the public's interest, the court reiterated that "the City has made a colorable showing that privacy, security and safety concerns are implicated by recording in police precincts" (A107). But the court felt constrained by its interpretation of the Right to Record Acts and held that they legislatively superseded those equitable concerns (*id.*).

The court did not tailor its preliminary injunction to this controversy. Instead, it enjoined the City from enforcing the Facilities Policy entirely, in any NYPD precinct lobby, "except to the extent consistent with the [Right to Record Acts]" (A108). The court further ordered the City to "remove any signs" inconsistent with its interpretation of the Right to Record Acts from any precincts in the City, further underscoring the universal dimension of the court's injunction (*id.*).

24

### 4. Subsequent procedural history

The City noticed an appeal on November 3, 2023 (A191). That same day, the district court granted a 14-day stay of its injunction (A8). However, on November 7, at plaintiff's urging, the district court switched course and gave the City just two days before it was required to take steps toward implementing the injunction (A8-9). Later that day, the City moved in this Court for a stay pending appeal and an administrative stay pending a ruling on the stay motion (Dkt. No. 8). On November 8, a Judge of this Court granted an administrative stay (Dkt. No. 17). Consequently, the Facilities Policy is currently being enforced. The Court has not at this time resolved the City's motion for a stay pending appeal.

## STANDARD OF REVIEW
## AND SUMMARY OF ARGUMENT

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (cleaned up).[21] This Court reviews a district court's weighing of the preliminary injunction factors "for an abuse of discretion, examining [the] district court's legal conclusions de novo and its factual conclusions

---

[21] This brief uses "(cleaned up)" to indicate that internal quotation marks, alterations, or citations have been omitted from quotations.

for clear error." *Conn. State Police Union v. Rovella*, 36 F.4th 54, 61-62 (2d Cir. 2022). "A party seeking a preliminary injunction must establish 1) a likelihood of success on the merits, 2) a likelihood of irreparable harm absent relief, 3) that the balance of equities was in its favor, and 4) that an injunction is in the public interest," *Metro Life Ins. Co. v. Bucsek*, 919 F.3d 184, 188 n.2 (2d Cir. 2019), with the latter two factors merging where, as here, "the government is a party to the suit," *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 295, 266 (2d Cir. 2021) (per curiam). Plaintiff failed to make a sufficient showing on any of these prongs.

*First*, plaintiff failed to show that, absent a preliminary injunction, he would suffer irreparable harm. *See JTH Tax, LLC v. Agnant*, 62 F.4th 658, 672 (2d Cir. 2023). His only argument below was that irreparability is presumed for violations of the First Amendment. But no automatic presumption of irreparable harm applies to mere statutory violations. *See, e.g., Stewart v. U.S. I.N.S.*, 762 F.2d 193, 199-200 (2d Cir. 1985); *Holt v. Continental Grp.*, 708 F.2d 87, 90-91 (2d Cir. 1983). And plaintiff never articulated why not being able to film during the litigation, rather than waiting until its completion, would harm him, or why that harm would not be compensable. Though plaintiff testified that unnamed third

26

parties want him to record them filing police complaints, harm to these third parties is irrelevant under this factor. Likewise, the district court's broad appeal to government transparency, where unconnected to a specific and irreparable injury to plaintiff, fails to justify injunctive relief.

*Second,* plaintiff is also unlikely to prevail on the merits. The district court properly held that he failed to show the Facilities Policy likely violated the First Amendment, but erred in determining that plaintiff is likely to succeed on his claims under the State and City Right to Record Acts. Civ. Rights L. § 79-p; Admin. Code § 14-189. As an initial matter, the court should not have reached the merits of those claims at all. There has been no published New York decision analyzing the Right to Record Acts, let alone in the context of recordings inside government buildings. Because plaintiff's Right to Record Act claims involve first-impression questions of state law—which carry fraught policy considerations to boot—the court should have declined supplemental jurisdiction.

The district court's decision to venture into uncharted areas of state law had unfortunate consequences: the court misconstrued the Right to Record Acts. Under New York law, "a clear and specific legislative intent

is required to override the common law," *Hechter v. New York Life Ins. Co.,* 46 N.Y.2d 34, 39 (1978), and the NYPD has long retained common-law, proprietary authority to control access to its facilities. Had the State Legislature or City Council wanted to overrule this precept, it would have said so clearly, and neither did. To the contrary, while the Acts allow people to record "any activity" of the police (subject to certain conduct-based exceptions), they do not specify the *places* where such recordings must be allowed. Thus, applying controlling principles of New York statutory interpretation, the district court should have held that the Acts do not disturb the NYPD's common-law proprietary rights. This reading, moreover, is necessary to avoid unreasonable and absurd outcomes. Under plaintiff's and the district court's contrary interpretation, there would be no textual basis under the Acts to stop visitors from recording within prisons or courthouses, for example.

The City's construction of the Acts is also strongly supported by legislative history. As the City Right to Record Act's sponsor confirmed when he first introduced the bill, "[i]t does not create any new rights." 2018 NYCC Tr. 42. The purpose of both the City and State Right to Record Acts was to codify a First Amendment right to record police in

public that had been recognized by other federal courts of appeals and create a private, statutory mechanism to enforce this right. There is no evidence that lawmakers intended the Acts to go further and enshrine a broad right to record in government buildings that is not compelled by the First Amendment.

*Third*, the remaining preliminary injunction factors—the balance of equities and the public interest—also disfavor an injunction. As the district court found, sexual-assault and domestic-violence victims may be less willing to go to a precinct to make a report if they know that they may be captured on camera, and confidential informants could be exposed to reprisals if their anonymity were compromised. Consequently, the Facilities Policy is necessary to prevent a chilling effect on crime reporting. The policy also addresses serious safety risks that are increased when civilians can observe sensitive features like security codes and the locations of weapons. Though observers may be able to see these things without a recording device, recordings create permanent images, and once posted online become accessible to anyone and available for their audio and visuals to be scrutinized and even enhanced. Indeed, many courts—including this one—impose strict controls on who may

broadcast proceedings, even when those proceedings are already open to the public.

*Fourth*, even if some form of preliminary injunction had been warranted, the district court's injunction was impermissibly overbroad By prohibiting NYPD from enforcing its policy against nonparties to this case, and requiring it to take down signage for the benefit of nonparties rather than plaintiff, the district court's order ventured beyond the case and controversy before it. In this way, the court exceeded its Article III jurisdiction, which requires remedies to be tailored to redress the particular injuries of particular parties. Separate and aside from all of that, the court disregarded a foundational principle of injunctive relief: that an injunction should impose no greater burden on the defendant than necessary to provide complete relief to the plaintiff.

## ARGUMENT

### POINT I

### PLAINTIFF HAS NOT SHOWN THAT HE IS LIKELY TO SUFFER IRREPARABLE HARM

A likelihood of irreparable injury is "the single most important prerequisite for the issuance of a preliminary injunction." *JTH Tax, LLC v. Agnanti*, 62 F.4th 658, 672 (2d Cir. 2023) (cleaned up). The movant

30

must show that, "absent [the] injunction, they will suffer an injury that is … actual and imminent, and … cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* Plaintiff fell woefully short of carrying that burden here.

Importantly, when plaintiff moved for a preliminary injunction, he did not even attempt to spell out the form of irreparable harm he was likely to suffer. Instead, his memorandum of law—characterizing the Facilities Policy as a violation of the First Amendment—relied *exclusively* on a presumption of irreparable injury arising from constitutional violations. During a hearing on his motion, plaintiff's attorney attempted to piggyback his Right to Record Act claims onto this theory of irreparable injury by noting that the Acts "protect[] the same rights" and involve "the same harm" (A173-74). But plaintiff did not otherwise elucidate a theory of irreparable harm independent from the presumption applicable to First Amendment violations.

In light of his affirmative burden to demonstrate irreparable harm, the theory plaintiff advanced below was plainly insufficient and should have been rejected. While harms arising from constitutional violations

31

may, in some cases, be presumed irreparable, plaintiff's constitutional arguments were soundly rejected (A91-102).

Instead, the district court's injunction was predicated on plaintiff's statutory rights under the State and City Right to Record Acts. But the mere fact that a statute has been violated does not warrant the same presumption of irreparable harm. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544-45 (1987) (presumption of irreparable harm based on statutory violation was "contrary to traditional equitable principles"); *Huntington v. Marsh*, 884 F.2d 648, 651 (2d Cir. 1989) ("The Supreme Court has explicitly rejected the notion that an injunction follows as a matter of course upon finding a statutory violation"); *Stewart v. U.S. I.N.S.*, 762 F.2d 193, 199-200 (2d Cir. 1985) ("reputation[al]" harm from statutory violation not "sufficient to justify injunctive relief"); *Holt v. Continental Grp.*, 708 F.2d 87, 90-91 (2d Cir. 1983) (no presumption of irreparable harm in Title VII and § 1981 retaliation cases); *see also Fish v. Kobach*, 840 F.3d 710, 751 n.24 (10th Cir. 2016) (concluding that, under *Amoco*, irreparable harm based on a statutory violation should not be presumed even where the statute provides for injunctive relief); *Nat. Res. Def. Council v. Texas*, 906 F.2d 934, 941 (3d Cir. 1990) (holding that it

was error for a district court to presume "irreparable harm from the mere fact of statutory violation").

Beyond abstract interference with a purported statutory right, plaintiff has not explained why he will suffer irreparable consequences without a preliminary injunction. Though plaintiff would prefer to film now rather than later, the "[p]ersonal inconvenience" of being made to wait until the end of this litigation does not justify injunctive relief. *Local 553, Tr. Workers Union v. Eastern Air Lines, Inc.*, 695 F.2d 668, 677 (2d Cir. 1982). Furthermore, plaintiff presented no evidence as to why monetary damages would be difficult to measure or inadequate to compensate him. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).

Plaintiff testified that "people want" him to film them filing complaints and to "show" those videos on his "social media channels" (A122). But plaintiff never explained why it was so important to these unnamed third parties that someone record them inside the precinct. The fact that someone wants him to do it does not constitute irreparable harm.

Equally fundamentally, it is irrelevant whether a preliminary injunction would frustrate the desires of these third parties; plaintiff's burden is to show why *he* would be irreparably harmed. *See Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish … that *he* is likely to suffer irreparable harm …." (emphasis added)); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018) ("Plaintiffs seeking injunctive relief must show that they themselves are likely to suffer irreparable harm absent an injunction."); *Expedia, Inc. v. United Airlines*, No. 19-cv-1066, 2019 U.S. Dist. LEXIS 59037, at *17-*18 (S.D.N.Y. Apr. 5, 2019) ("These injuries to third parties do not demonstrate that Expedia itself will suffer irreparable harm."); *Fed. Ins. Co. v. Metro. Transp. Auth.*, No. 17 Civ. 3425, 2017 U.S. Dist. LEXIS 106134, at *8 (S.D.N.Y. Jul. 10, 2017) ("[T]heoretical possibility of harm to third parties is not relevant to, and does not establish, the required showing of irreparable harm to [plaintiff].").

The district court, for its part, cited the importance of "[t]ransparency in government" in concluding that plaintiff's harm was irreparable (A106). But that abstract concept cannot substitute for proof

of concrete and imminent harm. In any case, this logic runs aground against the same issue cited above: while governmental transparency may often benefit the public, the district court did not connect the dots as to why *plaintiff* will be irreparably harmed. *See Winter*, 555 U.S. at 20; *Nat'l Wildlife Fed'n*, 886 F.3d at 822. And furthermore, mere delay in the public's ability to watch videos of the interiors of police precincts is not an "irreparable" consequence. *Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1317 (1983) (Blackmun, J., in chambers) (delay in disclosure of information possessed by the government not irreparable harm).  The authority that the district court purported to rely on (A106) does not support a contrary proposition. *See Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 14 (D.C. Cir. 2009) (merely observing that government transparency was a "vital" interest as relevant to the analysis of whether a lobbyist disclosure statute violated the First Amendment).

In any event, there is no evidence that plaintiff's activities in police precincts actually promote transparency in government. Tellingly, while plaintiff's lengthy complaint recites numerous instances of alleged police misconduct (A19-21), none occurred inside a precinct lobby. Nor did his hearing testimony provide any real-world examples of the same. Plaintiff

35

admitted that he "go[es] into precincts all over the country" (A122), but he did not identify a single instance of police misconduct, or anything else of substantial journalistic interest, that he has filmed in precinct lobbies. In truth, plaintiff's self-promotional activities have no connection to the soaring democratic ideals he invokes. His desire not to be subjected to the measures NYPD has taken to protect other people's privacy and safety in precincts lobbies does not mean he has been harmed, let alone irreparably.

## POINT II

## PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS

### A. The district court abused its discretion in exercising supplemental jurisdiction over the Right to Record Act claims.

The district court, having correctly concluded that plaintiff was not likely to prevail under the First Amendment, should have stopped there and declined supplemental jurisdiction over plaintiff's Right to Record Act claims. Although a decision whether to exercise supplemental jurisdiction is discretionary, that discretion is constrained by the "fundamental" principle that "needless decisions of state law should be avoided both as a matter of comity and to promote justice between the

36

parties, by procuring for them a surer-footed reading of applicable law." *Young v. N.Y.C. Tr. Auth.*, 903 F.2d 146, 163-64 (2d Cir. 1990) (cleaned up); *see also Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 405 (2d Cir. 2017) (Calabresi, J., concurring) ("In general … our circuit takes a very strong position that state issues should be decided by state courts.").

A district court may decline supplemental jurisdiction where "(1) the [state] claim raises a novel or complex issue of [s]tate law, (2) the [state] claim substantially predominates over the claim … over which the court has original jurisdiction, (3) the district court has dismissed all claims over which it had original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). Here, while the district court did not dismiss plaintiff's federal claim outright,[22] other § 1367 factors so strongly counsel against supplemental jurisdiction that the district court abused its discretion in asserting it. *See Carver v. Nassau Cty. Interim Fin. Auth.*, 730 F.3d 150, 154-55 (2d Cir. 2013) (determining that district court abused its discretion in exercising supplemental jurisdiction even

---

[22] A motion to dismiss plaintiff's claims is now pending in the district court. *See Reyes*, No. 1:23-cv-06369-JGLC, ECF Nos 73-75 (S.D.N.Y. Feb. 5, 2024).

though federal claim was not dismissed); *Fay v. S. Colonie Cent. Sch. Dist.*, 802 F.2d 21, 34 (2d Cir. 1986) (same, where federal claims were dismissed only in part), *overruled on other grounds by Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768 (2d Cir. 2002).

In particular, the district court waded into an unresolved issue of state law. *See* 28 U.S.C. § 1367(c)(1); *Carver*, 730 F.3d at 154; *Young*, 903 F.2d at 164; *Fay*, 802 F.2d at 34. The Right to Record Acts are less than four years old. The City is not aware of any published decision of a New York state court, either at the appellate or trial level, interpreting the Right to Record Acts in *any* context—let alone in the fraught context of NYPD precincts where significant legal and policy considerations abound.[23]

Rather than become the first court to address those issues, the district court should have allowed them to percolate in the state courts.

---

[23] Nor have the Right to Record Acts been subject to significant judicial analysis in the few federal district court opinions that have mentioned them. *See, e.g., Heggs v. City of N.Y.*, No. 17-CV-3234, 2023 U.S. Dist. LEXIS 149647, at *39 n.14 (E.D.N.Y. Aug. 24, 2023); *Guarniere v. City of N.Y.*, No. 21cv1739, 2023 U.S. Dist. LEXIS 40936, at *7-*8 (S.D.N.Y. Mar. 10, 2023); *see also Adamides v. Warren*, No. 21-CV-6613, 2022 U.S. Dist. LEXIS 125758, at *43 (W.D.N.Y. Jul. 15, 2022) (declining supplemental jurisdiction over SRTRA claim in the interests of "judicial economy, convenience, fairness and comity.").

The district court reasoned that the issues were not novel because the Acts' language was "clear and unambiguous" (A103), but the court's interpretation of the Acts was simply incorrect (infra Point II.B). Moreover, a proper interpretation of the Acts may require resort to legislative history—a task state courts may be better disposed to fulfill (infra Point II.B.4). *See Young*, 903 F.2d at 164. To be clear, this Court need not agree with the City's construction of the Acts to hold that the district court went too far. It need only determine that the issue is too unsettled for supplemental jurisdiction to have been appropriate.

Moreover, plaintiff's Right to Record Act claims implicate significant governmental interests, which is itself compelling reason to decline jurisdiction. *See* 28 U.S.C. § 1367(c)(4); *Carver*, 730 F.3d at 154; *Seabrook v. Jacobson*, 153 F.3d 70, 72 (2d Cir. 1998). Forcing the NYPD to allow recordings inside each of its precinct buildings would mark a significant policy shift. As the district court recognized, it would expose officers and civilians alike to major privacy and security risks (A99-101). More broadly, the district court's construction of the Acts could lead to a host of other, absurd consequences—including perhaps allowing people to bring cellphones into prisons and courthouses and broadly record

39

within those facilities (infra Point II.B.3). The court should not have pressed forward with that outcome before state courts have had a chance to examine whether the Facilities Policy violates state or local law.

### B. The Facilities Policy does not violate the Right to Record Acts.

Even if the district court properly asserted supplemental jurisdiction, it erred in concluding that the Facilities Policy likely violated the Right to Record Acts.

By focusing on whether the Right to Record Acts "carve out" precinct lobbies (A104), the district court ignored the antecedent question: whether the Acts contain positive authority for a right to record on NYPD property without NYPD permission in the first place. Any argument that the City Right to Record Act does so must rest on six words: "A person may record police activities …." N.Y.C. Admin. Code § 14-189(b). And the critical words of the State Right to Record Act are no less delphic: "A person … has the right to record law enforcement activity …." N.Y. Civ. Rights L. § 79-p(2). Of course, there are additional provisions in the Acts—defining terms, addressing what activities fall within the scope of this right, and delineating private remedies, *see*

Admin. Code § 14-189(a)-(d); Civ. Rights L. § 79-p(1)-(4)—but none of them expand the right to record to all locations.

Contrary to the district court's view, the "right" established by these statutes is not self-defining, and a more searching exercise in statutory construction is necessary to understand its contours. The key question is whether the statutes permit recording on terms consistent with background principles of property law or whether they override those principles (and if so, to what degree). Fundamentally, plaintiff's and the district court's construction of the Acts relies on an inferential leap: that when a legislature says "people can record the police" (A104), it means people can record them in any publicly accessible area, notwithstanding the wishes of the relevant property owner. But the Right to Record Acts don't say that. And nothing in the text of the Right to Record Acts even distinguishes between public and nonpublic areas of police precincts (or other buildings). Unless it is plaintiff's position that the statutory right to record applies literally everywhere—including courtrooms, prisons, and non-public areas of police precincts (infra Point II.B.3), and on private property where the owner denies permission to record—then some form of line-drawing is required. The question is how best to draw

41

that line. Plaintiff and the district court's construction admits of no principled way to do so.

Fortunately, there is an elegant solution. The district court should have looked to ordinary property-law concepts to demarcate the Acts' bounds. In holding that the Facilities Policy violated the Right to Record Acts, the district court failed to appreciate that when the NYPD denies members of the public permission to record inside its facilities, it is doing so in its capacity as a property owner. As the following sections explain in greater depth, New York principles of statutory construction require a clear statement of legislative intent before a statute will be understood to abrogate the common law—such as the common law of property. And thus the Acts here must be construed to permit recording on terms that are consistent with property-law principles, rather than to extinguish them.

That property owners may prohibit members of the public from filming on their premises is clear enough when the property is privately owned. Theaters typically don't allow members of the audience to record plays on their cellphones, and a university may prohibit students from filming lectures in class. Someone who violates these reasonable

restrictions may be directed to leave. In the same vein, a private property owner is at liberty to tell a guest not to record the police officers who happen to be on the premises—say, where they have been called to address a sensitive domestic matter. If the guest defies that directive and refuses an order to leave, law enforcement may remove them—not because they recorded the police, but because their disobedience of the owner's request to leave makes them a trespasser. *See* N.Y. Penal Law § 140.00(5), 140.05. Neither plaintiff nor the district court contended that the Right to Record Acts would prohibit law enforcement from taking such action to enforce the owner's property rights (*see* A71 (noting that the Acts codify a right to record on "private property" only where the individual has "a legal right to be present")).

The same principles operate when the proprietor and the law enforcer are the same entity. While the Right to Record Acts prohibit individual "officer[s]" from interfering with recordings in their law enforcement capacities, Civ. Rights L. § 79-p(3); Admin. Code § 14-189(c), they do not prohibit the City as a whole, or its agencies, from establishing conditions of entry into government facilities—including bans on recording. The NYPD issued the Facilities Policy in this proprietary

43

capacity so that civilians do not misuse their right of access in a way that jeopardizes the privacy and security of others. Individual officers should enforce that policy just as they would enforce any comparable policy by a private owner, and they do not violate the Right to Record Acts when doing so.

### 1. The City has a common-law proprietary right to control access to, and maintain order within, its property.

Settled canons of statutory construction in New York direct courts to avoid interpreting New York statutes in ways that derogate the common law. *See Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 37 N.Y.3d 591, 619 (2021) ("[S]tatutes in derogation of the common law must be strictly construed" (cleaned up)). This is a clear-statement rule: "a clear and specific legislative intent is required to override the common law." *Hechter v. New York Life Ins. Co.,* 46 N.Y.2d 34, 39 (1978). These principles apply with special force where, as with the Right to Record Acts, a statute purports to "creat[e] liability where none previously existed." *Vucetovic v. Epsom Downs, Inc.*, 10 N.Y.3d 517, 521 (2008) (cleaned up).

44

More to the point, New York courts strictly construe statutes that derogate the common law of *property. See Allen v. Adami*, 39 N.Y.2d 275, 277 (1976); *Thomson Indus., Inc. v. Port Washington North*, 27 N.Y.2d 537, 539 (1970); *Matter of Robert E. Havell Revocable Trust v. Zoning Bd. of Appeals of Vill. of Monroe*, 127 A.D.3d 1095, 1097 (2d Dep't 2015). And bringing it home even further, New York courts strictly construe statutes that derogate the common-law rights or responsibilities of *municipal* property owners. *See Gorman v. Town of Huntington*, 12 N.Y.3d 275, 279 (2009); *Lofaro v. City of New Rochelle*, No. 53694/2001, 2013 N.Y. Misc. LEXIS 5132, at *5 (Sup. Ct., Westchester Cty. Oct. 7, 2013); *see also Boonville v. Maltbie*, 272 N.Y. 40, 48-49 (1936) (declining to construe statute to impose more onerous obligations on municipal owners than private ones).

Thus, unless the text clearly indicates otherwise, the Right to Record Acts must be harmonized with background principles of property law applicable to municipalities. And few sticks in the bundle of property rights are more fundamental than "[t]he power to exclude." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982). Under New York law, "a person is licensed or privileged to enter private

45

premises [only] when [they have] obtained the consent of the owner[.]" *People v. Graves*, 76 N.Y.2d 16, 20 (1990) (cleaned up). As a corollary, an owner may attach conditions to the right of a licensee to enter, remain on, or use their property. *See Wheelock v. Noonan*, 108 N.Y. 179, 183-84 (1888); *Hall v. Louis Weber Bldg. Co.*, 36 Misc. 551, 554 (App. Term 1901); *Hospitality Grp. of Am. v. Terrace on the Park, Inc.*, No. 92 Civ. 6814, 1993 U.S. Dist. LEXIS 5163, at *7-*9 (S.D.N.Y. Apr. 15, 1993); Restatement 2d of Torts § 168. At common law, if a licensee failed to comply those conditions, the owner could revoke consent and the licensee would then be deemed a trespasser. *See Wheelock*, 108 N.Y. at 184; Restatement 2d of Torts §§ 168 cmt d, 171(a). New York's modern criminal laws against trespass are based on the same core principle. *See* Penal Law §§ 140.00 *et seq.* They provide that individuals who enter or remain on publicly accessible property lose their "license and privilege" to do so if they "def[y] a lawful order not to enter or remain" communicated to them by the owner. *Id.* § 140.00(5).

Just as private owners may restrict access to their property, so too may governments. *See Rogers v. N.Y.C. Tr. Auth.*, 89 N.Y.2d 692, 698 (1997) ("[T]he Government, no less than a private owner of property, has

power to preserve the property under its control for the use to which it is lawfully dedicated" (cleaned up); *Hospitality Grp. of Am.*, 1993 U.S. Dist. LEXIS 5163, at \*8-\*9, \*13 (granting partial summary judgment on City of New York's claim that licensee exceeded restrictions on use of city-owned property). Even when members of the public behave in a manner that is compatible with the intended use of the facility, they do not have an unrestricted "right of access to public property" under New York law. *Rogers*, 89 N.Y.2d at 702.

Of course, the government's authority to exclude is not absolute. It is constrained by the Constitution, including the First Amendment's public forum doctrine, and its analogue under the New York State Constitution. *See Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 678-79 (1992); *Rogers*, 89 N.Y.2d at 698-99, 702. But it is because of the privileges that the government enjoys as a property owner that its actions are subject to relaxed scrutiny under this doctrine. *See Krishna Consciousness*, 505 U.S. at 678 ("Where the government is acting as a proprietor, managing its internal operations, rather than acting as a lawmaker with the power to regulate or license, its action will not be

47

subjected to the heightened review to which its actions as a lawmaker may be subject.").

Thus, New York courts have affirmed that individuals may lawfully be excluded from a variety of publicly owned spaces: common areas of public housing, *People v. Barnes*, 26 N.Y.3d 986, 989 (2015); public colleges and universities, *People v. Young Kahng*, 52 Misc. 3d 1, 5-6 (App. Term, 2d Dep't 2016); *People v. Munroe*, 18 Misc. 3d 9, 10-11 (App. Term, 2d Dep't 2007); *Bd. of Higher Ed. v. Students for a Democratic Soc'y*, 60 Misc. 2d 114, 118 (Sup. Ct., Queens Cty. 1969); school buildings, *Ellis v. Allen*, 4 A.D.2d 343, 344 (3d Dep't 1957); Department of Health buildings, *People v. Alderson*, 144 Misc. 2d 133, 145 (Crim. Ct., N.Y. Cty. 1989); and—of course—police buildings, *People v. Reape*, 22 Misc. 3d 615, 617-19 (Sup. Ct., Kings Cty. 2008); *People v. Martinez*, 43 Misc. 2d 94, 96-98 (Crim. Ct., N.Y. Cty. 1964).

*Martinez* is particularly instructive. There, the defendants entered NYPD headquarters, demanded a meeting with the Commissioner, seated themselves on the floor of a "public corridor," and refused orders to leave. 43 Misc. 3d at 95-96. A three-judge criminal panel found them guilty of unlawful intrusion on real property, reiterating that "a so-called

48

public building, especially one which houses so vital a functioning department as the Police Department, may not be used in a manner which suits the whim or caprice of every citizen[.]" *Id.* at 97-98. Though the defendants' unruly behavior may have separately amounted to a breach of the peace, the court noted that this was "immaterial," *id.* at 98, as the court reached its conclusion by relying on common-law property concepts—namely, NYPD's "exclusive right … to exclude" individuals from city-owned property, *id.* at 97 (cleaned up).

*Reape* is a more recent case applying the same principle. There, a state criminal court denied a motion to dismiss a trespass count where the defendant allegedly ignored an order to leave a police precinct. 22 Misc. 3d at 616. The court explained that the police, as the "custodian[s]" of the premises, were "in the best position to know whether the defendant had acted in a way that required him to be asked to leave." *Id.* at 619. Once the defendant was ordered to leave, this "was enough to revoke [his] license to remain upon the precinct property." *Id.* The court underscored that precincts are used by "citizens who seek to give or obtain information about police safety," and "[t]hose who enter in order to use the facilities … need to know that their safety is being protected[.]" *Id.* at 618-19.

49

### 2. The Right to Record Acts do not abrogate the City's common-law proprietary rights.

The Facilities Policy invokes the City's common-law right as a proprietor by prohibiting recordings in NYPD precincts to maintain the proper functioning of those precincts. If the State Legislature or City Council wanted to abrogate this longstanding prerogative, they would have said so clearly. *See Hechter*, 46 N.Y.2d at 39 ("[I]t is a general rule of statutory construction that a clear and specific legislative intent is required to override the common law."). Indeed, the State Legislature and City Council have demonstrated that, when they intend to prescribe limits on whom the government can exclude from its property, they know how to speak in clear and unambiguous terms. *See, e.g.,* N.Y. Exec. L. §§ 292(9), 296(2)(a) (prohibiting discrimination by any "owner" of a "place of public accommodation, resort or amusement," defined to include property owned by "a state or local government entity"); N.Y.C. Human Rights L. §§ 8-102, 8-107(4)(a) (prohibiting discrimination by any "person who is the owner" of a "place or provider of public accommodation," where "person" includes "governmental bodies or agencies").

It is true that the CRTRA and SRTRA define both "police activity" and "law enforcement activities" to mean "any activity by an officer acting

under the color of law." Civ. Rights L. § 79-p(1)(b); Admin. Code § 14-189(a). But the word "any" modifies "activity"; it does not define the place where "any activity" may be filmed. Statutes are frequently silent about their locational orbit, but that does not mean they apply everywhere. Quite the contrary: courts must presume that such statutes *do not* apply universally, as illustrated by the presumption against extraterritoriality under both New York and federal law. *See Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010); *S.H. v. Diocese of Brooklyn*, 205 A.D.3d at 187 (2d Dep't 2022); *Rodriguez v. KGA Inc.*, 155 A.D.3d 452, 453 (1st Dep't 2017). Just as "generic terms like 'any' or 'every' do not rebut the presumption against extraterritoriality," *Kiobel v. Royal Dutch Petro. Co.*, 569 U.S. 108, 118 (2013), the Acts' use of the phrase "any activity" does not imply that they apply inside government-owned buildings in derogation of the common law.

The district court also placed significant weight on the fact that the Acts set forth forms of conduct—such as physical interference with law enforcement or obstruction of governmental administration, Civ. Rights L. § 79-p(2), (3)(b); Admin. Code § 14-189(b), (c)(2)(i)—that are excluded from statutory protection (A104, 105). But the court's reliance on these

51

provisions was misplaced. The Acts' behavior-based exceptions say nothing about *where* the right to record extends. And contrary to what the district court held, it was not necessary for lawmakers to explicitly "carve out police precinct lobbies as places where individuals are not allowed to record" (A104). Because the Acts are silent about whether they extinguished NYPD's rights as a proprietor, the canon against derogating the common law point the way—and make clear that they do not. *See Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 447 (2003) (statutory "silence often reflects an expectation that courts will look to the common law to fill gaps in statutory text").

> ### 3. The district court's reading would lead to hard questions about individuals' "rights" to record in courthouses, prisons, and non-public areas of police precincts.

The imperative to construe the Right to Record Acts in harmony with property-law concepts becomes clearer when we consider scenarios other than police precinct lobbies. Neither plaintiff nor the district court stopped to consider just how broadly their interpretation of the Acts sweeps, but future courts will undoubtedly look to this case to decide how the Right to Record Acts apply in these other contexts. And New York's

highest court has repeatedly instructed courts to avoid construing New York statutes in a manner that leads to "unreasonable or absurd application[s]." *Lubonty v. U.S. Bank Nat'l Ass'n*, 34 N.Y.3d 250, 255 (2019) (cleaned up); *accord People v. Pabon*, 28 N.Y.3d 147, 156 (2016).

If, as the district court held, the State Legislature and City Council had to "carve out" each and every place where recording could be prohibited (A104), individuals escorted into *non-public* areas of police precincts (such as line-up rooms) would also seem to have the right to record any police activities they see around them. That is because, on the surface, the Acts do not distinguish between public and non-public areas. Officers could not require an individual to leave their cellphone outside these restricted areas because seizing a recording device constitutes interference with recording. *See* Civ. Rights L. § 79-p(3)(a)(v); Admin. Code § 14-189(c)(1)(d).

Similarly, under the district court's construction, individuals visiting state prisons would apparently be able to bring their cellphones inside and film correctional officers. *See* Civ. Rights L. § 79-p(1)(a) ("Officer" includes "peace officer"); N.Y. Crim. Proc. L. § 2.10(25) ("peace officers" include "correction officers of any state correctional facility or of

any penal correctional institution"). Again, the prison could not require such individuals to check their cellphones outside because seizing a recording device constitutes unlawful interference. *See* Civ. Rights L. § 79-p(3)(a)(v).

Finally, under the district court's interpretation, there would seemingly be no textual basis to stop individuals visiting a state or municipal courthouse from bringing their cellphones inside to record court security officers. *See* Civ. Rights L. § 79-p(1)(a) ("Officer" includes "security officer[s], security guard[s] or similar official[s] who [are] engaged in a law enforcement activity"); *id.* § 79-p(1)(b) ("'Law enforcement activity' means any activity by an officer acting under the color of law"). During certain proceedings, such as criminal sentencings, spectators could freely bring their cellphones into the courtroom and record any security officers inside. *See People v. Ashdown*, 12 Misc. 3d 836, 838 (Sup. Ct., Rensselaer Cty. 2006) (holding that New York Civil Rights Law § 52, which prohibits audiovisual coverage of certain proceedings, does not apply to sentencings).

These absurdities evaporate when the Acts are construed as the City urges. Police precincts, prisons, courthouses, and other government

54

installations are government property, and it is by exercising its proprietary rights that the government may bar recording in each of the above scenarios. *See Martinez*, 43 Misc. 2d at 96-98.

### 4. Legislative history confirms that the Right to Record Acts do not enshrine broader rights than the First Amendment inside government buildings.

Though this Court need not examine legislative history to embrace the City's construction of the Acts, that history confirms that the City's interpretation is correct. *See People v. Wallace*, 31 N.Y.3d 503, 507-09 (2018) (looking to legislative history to interpret statute); *People v. Roberts*, 31 N.Y.3d 406, 423 (2018) (same). The Acts were never intended to prohibit the NYPD from banning recordings on its premises. Instead, when the State Legislature and City Council considered the bills that became the SRTRA and CRTRA, there was a strong consensus that the laws merely codified—and added teeth to—an already recognized right to record under the First Amendment. And these lawmakers were predominantly focused on this right as applied to public places, not government buildings. Nothing in the legislative history suggests that

55

the Acts were intended to guarantee broader rights than the First Amendment inside government buildings.

Start with the obvious: neither the SRTRA nor the CRTRA could have been drafted with the Facilities Policy in mind, because the original versions of these bills were introduced before the Facilities Policy was ever issued. Earlier versions of the SRTRA were introduced in 2016 and 2017, *see* Senate Bill 2015-S8074; Assembly Bill 2015-A10387A, and the CRTRA was initially introduced in March of 2018, *see* 2018 NYCC Minutes 1093-94. But the Facilities Policy was only codified in the Patrol Guide in June 2018 (A46, 47).

The text of the bills as enacted in 2020 was virtually unchanged from the original versions mentioned above, and there were no changes relevant to recordings inside police precincts. That is significant because at least one key lawmaker—City Councilmember Donovan Richards, the chair of the Public Safety Committee—became aware of public discussion surrounding the Facilities Policy while the CRTRA was under consideration. In August 2018, Richards told the press that he would "raise the issue" of recordings in police stations "when his committee considers the Right to Record Act[.]" *See* Ashley Southall, *Video of Man*

56

*Berating Officer Opens Debate Over Recording in Police Stations*, N.Y. Times (Aug. 21, 2018).[24] But neither the committee nor the Council at large discussed the issue on the record or proposed changes to the bill extending the right to record to police precincts.

Moreover, in 2020, an NYPD representative told the committee that the Department supported the "substance" of the CRTRA, which, he testified, was already reflected "in our Patrol Guide." 2020 NYCC Tr. 63. That same Patrol Guide codified the Facilities Policy (A47). Had the Council disagreed with the NYPD representative and intended to override the Facilities Policy, it could have clarified this in the CRTRA's text, or at least in contemporaneous public testimony. But it never did.

Rather, the legislative records from the City Council, State Senate, and State Assembly all indicate that the purpose of the Right to Record Acts was to enshrine an already-recognized First Amendment right to record the police. Before 2020, multiple federal circuits had recognized such a right. *See Fields v. City of Phila.*, 862 F.3d 353 (3d Cir. 2017); *Turner v. Lieutenant Driver*, 848 F.3d 678 (5th Cir. 2017); *ACLU of Ill. v.*

---

[24] Available at https://perma.cc/2USE-HNRF (accessed Feb. 16, 2024).

*Alvarez*, 679 F.3d 583 (7th Cir. 2012); *Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011); *Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000); *Fordyce v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995). The Second Circuit had not joined those others in recognizing a constitutional right to record the police. Nevertheless, the sponsors of the Right to Record Acts unanimously agreed that this right existed in theory. *See* Senate Sponsor's Mem.; Assembly Tr. 101; 2020 NYCC Tr. 36. The Senate Sponsor's memorandum, for instance, justified the SRTRA by referencing the "[s]everal Federal Circuit Courts" that "have issued clear and consistent opinions finding that the First Amendment … confers and protects the right of ordinary civilians to record police activity." Senate Sponsor's Mem.

At the same time, lawmakers believed it was difficult to enforce this right in practice. Many alleged that there were individual officers who were not respecting the right at all. Assembly Tr. 107, 116, 120-21; 2020 NYCC 36; *see also* NYCC Rep. 6. And because the right to record police was not (and still is not) clearly established under Supreme Court or Second Circuit precedent, a lawsuit against an officer under 42 U.S.C. § 1983 likely would have failed on qualified immunity grounds. *See Bacon*

*v. Phelps*, 961 F.3d 533, 545 (2d Cir. 2020) ("To determine whether a right was clearly established, we generally look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation." (cleaned up)).

Hence, when Councilmember Williams introduced the bill that became the CRTRA, he explained: "*It does not create any new rights.*" 2018 NYCC Tr. 42 (emphasis added). Rather, he clarified, the bill "just gives a private right because if you had to push forward on your right with the constitution, it is much more onerous …." *Id.* The SRTRA's sponsor in the Assembly expressed similar sentiments. He confirmed that the bill's purpose was to clearly establish this right and provide a mechanism for its enforcement. *See* Assembly Tr. 101-102 ("I, and many New Yorkers … know they have the right. But this is not about you or I knowing, it's affirming this so that the police agencies like the NYPD will know for sure and not just know, but respect that right. And this bill will provide some kind of action that will hurt the City and their pocketbooks if they … cover for officers who violate that right … in disregard of the Constitutionality of the right."); *see also id.* at 108 (statement from different assemblymember that the bill "[t]ak[es] something that we

59

already know is a right and mak[es] it statutory so that there's a civil right of action").

Furthermore, in attempting to codify this constitutional right, state and city lawmakers were focused on its application to "public" spaces. *See* Assembly Tr. 117-18, 120, 126; 2020 NYCC Tr. 36. This made sense in light of recent events, in particular George Floyd's murder, which weighed heavily in the lawmakers' debates. *See* Assembly Tr. 114, 122, 128, 129, 131. Lawmakers also alluded to the public's need to record how police were responding to ongoing protests—which, of course, were predominantly occurring on public streets and sidewalks. *See id.* at 123, 124-35; 2020 NYCC Tr. 34-35. The SRTRA's sponsor in the Assembly explained that, in a paradigmatic case, "people on the streets" would need the law's protection to record "officers misbehaving[.]" Assembly Tr. 103. And the federal circuit precedent that the Acts drew from, *see* Senate Sponsor's Mem., unlike this case, all involved the right to record in quintessentially public spaces, *see Fields*, 862 F.3d at 356 (public sidewalk); *Turner*, 848 F.3d at 683 (public sidewalk); *ACLU of Ill.*, 679 F.3d at 588 ("public places," including "protests and demonstrations" in "public fora"); *Glik*, 655 F.3d at 79 (Boston Common); *Smith v. City of*

60

*Cumming*, No. 1:97-CV-1753, 1999 U.S. Dist. LEXIS 23875, at *13-*15 (N.D. Ga. Jan. 11, 1999), *aff'd* 212 F.3d 1332 (traffic stops); *Fordyce*, 55 F.3d at 439 ("the streets of Seattle").

In short, the legislative history shows that the Acts were intended to codify what the legislators understood to be a First Amendment right to record police in public and to add a civil right of action to strengthen that right. The Acts were not designed to enshrine such a right in government buildings like NYPD precincts, at least not to any degree beyond that which First Amendment jurisprudence already required. Accordingly, the Facilities Policy—which relates only to activities inside government buildings and is perfectly consistent with the First Amendment (A91-102)—does not fall within the intended scope of the Acts' prohibitions.

## POINT III

### THE BALANCE OF EQUITIES AND PUBLIC INTEREST OVERWHELMINGLY FAVOR THE CITY

The balance of equities and public interest factors also tip decidedly in the City's favor. Unlike plaintiff, who can seek damages for any supposed "harm" he suffers while this litigation is pending, New Yorkers

61

will have no recourse if plaintiff or someone else violates their expectations of privacy inside the stationhouse.

The district court fully credited the NYPD's concern about a "chilling effect on crime reporting," noting that victims of domestic violence and sexual assault "may be less willing to go to a precinct to make a report if they know that they may be captured on camera doing so" and that confidential informants could "be exposed to reprisals" if their anonymity is compromised (A99). The court also credited the safety concerns presented when an individual records in precinct lobbies, and plaintiff himself has already recorded sensitive information, including a sergeant entering a security code into a keypad (A100-101). Giving unvetted members of the public carte blanche to surveil the interiors of police stationhouses, including "the location of weapons, keys to vehicles, … and gas connections" (A79), will expose the City to increased and possibly calamitous security risks.

Plaintiff argued that because people can see other civilians and security features in precinct lobbies, allowing them to record their observations poses no additional risk. But the district court rightly dispatched that tenuous logic: "Recording creates a permanent image.

Someone can record in high resolution and create images that are not visible to the naked eye. Audio may pick up on conversations or noises that a person's ear cannot hear. Editing or manipulating the video after it is taken may present additional concerns" (A99). In short: once a video is posted online, it is memorialized forever and accessible to anyone, and may be utilized by those with pure and impure motives alike. Indeed, many courts—including this one—impose strict controls on who may broadcast proceedings that are open to the public, *see* 2d Cir. Loc. R. App'x Pt. B, *Second Circuit Guidelines Concerning Cameras in the Courtroom*,[25] and in some proceedings, filming is prohibited outright, *see* Fed. R. Crim. P. 53; 22 N.Y.C.R.R. § 131.1(b)-(c). Analogous concerns animate the City's Facilities Policy here.

The City's security and privacy concerns predominate over the competing values the court cited, such as the right to "[a]ccess to information regarding public police activity" (A107). The district court effectively recognized as much when it acknowledged, as part of its analysis of the Facilities Policy's constitutionality, that plaintiff failed to

---

[25] Available at https://perma.cc/3QW2-3DVK (accessed Feb. 16, 2024).

show the policy was unreasonable (A98-102). But when it came to balancing the equities, the court believed that it was constrained by the Right to Record Acts, which—it had concluded—reflected a different policy choice (A107). In so doing, the district court shirked its responsibility to examine whether the balance of the equities and public interest supported a preliminary injunction even though the merits were not conclusively resolved. *See eBay v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ("According to well-established principles of equity … [a] plaintiff *must* demonstrate" that the balance of hardships and public interest support an injunction (emphasis added)). Though the Acts authorize injunctive relief and other "appropriate" remedies, Civ. Rights L. § 79-p(3)(c)-(d); Admin. Code § 14-189(c)(3)-(4), that does not override the traditional prerequisites for a preliminary injunction, *see eBay*, 547 U.S. at 391 (even where a statute authorizes equitable relief, "a major departure from the long tradition of equity practice should not be lightly implied" (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982))).

**POINT IV**

**THE DISTRICT COURT'S INJUNCTION WAS OVERBROAD**

Even if a preliminary injunction of the Facilities Policy were warranted (and it is not), the injunction actually entered was overbroad. By prohibiting the City from enforcing the Facilities Policy against not just plaintiff, but the entire world, the district court exceeded its jurisdictional and equitable bounds. The court "asserted the authority to issue [a] decree[] that purport[s] to define the rights … of … millions of people who are not parties" to the case. *United States v. Texas*, 143 S. Ct. 1964, 1980 (2023) (Gorsuch, J., concurring in the judgment). Rather than merely direct the City to allow plaintiff to record inside NYPD precinct lobbies, the court compelled the City to allow *any* person to record in *any* precinct. By its terms, this mandate applies to each of the NYPD's 77 precincts and every one of its approximately 36,000 sworn officers who, at any time, could encounter a person filming in a precinct.[26] Even more brazenly, the court forced the City to remove signs notifying the public of the policy. Since plaintiff was already aware that the policy was enjoined,

---

[26] NYPD, *About NYPD*, available at https://perma.cc/JXC8-DY5G (accessed Feb. 16, 2024).

requiring the City to remove these signs did not benefit him in any way and had no conceivable relation to any case or controversy involving him.

By issuing this vast injunction, the district court flouted the jurisdictional limits of the Cases and Controversies Clause. *See* U.S. Const. art. III; *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (under Article III, "[r]emedies … ordinarily operate with respect to specific parties" (cleaned up)); *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) (Article III requires a remedy to "be tailored to redress the plaintiff's particular injury"); *L.W. v. Skrmetti*, 73 F.4th 408, 415 (6th Cir. 2023) ("A court order that goes beyond the injuries of a particular plaintiff to enjoin government action against nonparties exceeds the norms of judicial power."). Indeed, multiple Justices of the Supreme Court—at least four so far—have raised serious questions about the constitutionality or permissibility of universal injunctions "direct[ing] how the defendant must act toward persons who are not parties to the case." *Dep't of Homeland Sec. v. N.Y.*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring in the grant of a stay, joined by Thomas, J.).[27]

---

[27] *See also Griffin v. HM Florida-ORL, LLC*, 144 S. Ct. 1, 2 (2023) (statement of Kavanaugh, J., respecting the denial of the application for a stay, joined by Barrett,

*(cont'd on next page)*

Jurisdictional issues aside, the preliminary injunction's scope flies in the face of equity. It is well settled that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *cf. Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930) (Hand, J.) ("A court of equity … cannot lawfully enjoin the world at large"). In this case, the district court granted any person the right to come into a NYPD precinct and film in violation of the Department policy. And it ordered NYPD signs explaining this policy to be taken down—not for plaintiff's benefit, but for the benefit of others. Expanding the injunction to "the world at large" in this manner magnifies the potential for harm to crime victims and other members of the public without providing plaintiff with any additional relief. It cannot be justified in light of the burden it places on the City and its residents. Thus, even if plaintiff had satisfied the requirements necessary for issuance of a preliminary injunction—and he met none of them—the injunction here would remain overbroad.

---

J., except as to footnote 1); *Texas*, 143 S. Ct. at 1980 (Gorsuch, J., concurring in the judgment, joined by Thomas & Barrett, JJ.); *Trump v. Hawaii*, 138 S. Ct. 2392, 2424-29 (2018) (Thomas, J., concurring).

## CONCLUSION

This Court should reverse the district court's order granting a preliminary injunction.

Dated:   New York, NY
             February 16, 2024

Respectfully submitted,

HON. SYLVIA O. HINDS-RADIX
*Corporation Counsel*
*of the City of New York*
Attorney for Appellant

By: _____
CHASE H. MECHANICK
Assistant Corporation Counsel

100 Church Street
New York, NY 10007
212-356-0846
cmechani@law.nyc.gov

RICHARD DEARING
CLAUDE S. PLATTON
CHASE H. MECHANICK
    *of Counsel*

68

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 13,319 words, not including the table of contents, table of authorities, this certificate, and the cover.

_____

CHASE H. MECHANICK