# 23-7640

## United States Court of Appeals for the Second Circuit

SEANPAUL REYES,

*Plaintiff-Appellee,*

*against*

CITY OF NEW YORK,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR APPELLEE

Andrew Case
Meena Roldán Oberdick
LatinoJustice PRLDEF
475 Riverside Drive
Suite 1901
New York New York
(212) 739-7506
acase@latinojustice.org

May 10, 2024
New York, New York

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................... 6

QUESTION PRESENTED .................................................................. 9

STANDARD OF REVIEW ................................................................... 9

SUMMARY OF ARGUMENT ............................................................ 11

FACTS ........................................................................................ 13

ARGUMENT ................................................................................. 35

I.      REYES WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION ........... 35

  A.    Reyes's Harm is Actual and Imminent .................................... 36

  B.    Reyes's Harm Cannot be Remedied Through Money Damages ........................ 38

II.     REYES IS LIKELY TO PREVAIL ON THE MERITS .................................... 41

  A.    The District Court Properly Interpreted the Plain Language of the
        Right to Record Act ........................................................... 43

  B.    The Government Cannot Use the Common Law Right to Exclude to
        Deny People Statutory Rights ................................................ 45

  C.    The Right to Record Acts' Legislative Histories Indicate They Should be Read
        Broadly ......................................................................... 51

  D.    If the Legislature Meant to Codify the First Amendment, it
        Meant to Embrace a Broad Interpretation of the First Amendment Right ........ 54

  E.    The NYPD Failed to Follow the Citywide Administrative Procedure Act
        so the Trespass Policy is Void .............................................. 58

III.    PUBLIC INTEREST AND THE BALANCE OF EQUITIES FAVOR PLAINTIFF . 60

IV.     THE COURT PROPERLY EXERCISED SUPPLEMENTAL JURISDICTION ........ 62

CONCLUSION .............................................................................. 63

2

# TABLE OF AUTHORITIES

## CASES

*1700 York Associates v. Kaskel*, 701 N.Y.S.2d 233 (N.Y. Civ. Ct. 1999)...................................59

*ACLU of Illinios v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) .......................................55

*Allianz Ins. Co. v. Lerner*, 416 F.3d 109 (2d Cir. 2005) .......................................11

*An v. City of New York*, 16-cv-5381, 2017 WL 2376576 (S.D.N.Y. June 1, 2017)............. 17, 25

*Bd. of Higher Educ. of City of N.Y v. Students for Democratic Soc'y,*
    *Queensborough Cmty. Coll. Chapter*, 60 Misc. 2d 114 (Sup. Ct. Queens Cty. 1969) ......... 50

*Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342 (2d Cir.2003) .......................................9

*Broughton v. State*, 37 N.Y.2d 451 (1975) .......................................40

*Elrod v. Burns*, 427 U.S. 347 (1976).......................................36

*Fields v. City of Phila.*, 862 F.3d 353 (3d Cir. 2017) .......................................55

*Gericke v. Begin*, 753 F.3d 1 (1st Cir. 2014) .......................................55

*HC2, Inc. v. Delaney*, 510 F. Supp. 3d 86 (S.D.N.Y. 2020).......................................59

*Hershey v. Goldstein*, 938 F. Supp. 2d 491 (S.D.N.Y. 2013) .......................................50

*Holt v. Cont'l Grp., Inc.*, 708 F.2d 87 (2d Cir. 1983) .......................................36

*Hosp. Grp. of Am., Inc. v. Terrace on the Park, Inc.*, 92-cv-6814,
    1993 WL 127209 (S.D.N.Y. Apr. 20, 1993).......................................48

*In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129 (2d Cir. 2008) .......................... 11, 25

*In re Police Officer Daniel Pantaleo*, NYPD Case No. 2018-19274.......................................17

*Innoviant Pharmacy, Inc. v. Morganstern*, 390 F. Supp. 2d 179 (N.D.N.Y. 2005).................39

*Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438 (2d Cir.1977).......................................39

*JTH Tax, LLC v. Agnant*, 62 F.4th 658 (2d Cir. 2023).......................................10

*Kelly v. Borough of Carlisle*, 622 F.3d 248 (3d Cir. 2010).......................................56

*Kramer v. Phoenix Life Ins. Co.*, 15 N.Y.3d 550 (2010).......................................43

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982).................. 45, 46

*Martinez v. Cuomo*, 459 F. Supp. 3d 517 (S.D.N.Y. 2020) .......................................36, 41

*Matter of Crucible Materials Corp. v New York Power Auth.*, 13 NY3d 223 (2009) .................43

*Mullins v. City of New York*, 626 F.3d 47 (2d Cir. 2010) .......................................36, 38

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.,*
    883 F.3d 32 (2d Cir. 2018) .......................................10

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109 (2018) .......................................43

*New York  v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015).......................................39

*New York C.L. Union v. New York City Transit Auth.,*
    684 F.3d 286 (2d Cir. 2012) .......................................9, 11, 36

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638 (2d Cir. 2015) .......................... 10

*New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42 (2d Cir. 2020) ..................... 38

*Otal Invs. Ltd. v. M/V CLARY*, 673 F.3d 108 (2d Cir. 2012) ................................................. 10

*People v. Barnes*, 26 N.Y.3d 986 (2015) ........................................................................ 48

*People v. Graves*, 76 N.Y.2d 16 (1990) ......................................................................... 46

*People v. Leonard*, 62 N.Y.2d 404 (1984) ........................................................... passim

*People v. Martinez*, 43 Misc. 2d 94 (Crim. Ct. 1964) ...................................................... 49

*People v. Reape*, 22 Misc. 3d 615 (2008) ...................................................................... 49

*People v. Reyes*, CR019322-23KN (Kings County, January 30, 2024) ........................... 28, 50

*People v. Young Kahng*, 52 Misc. 3d 1 (N.Y. App. Term. 2016) ....................................... 50

*Police Benevolent Ass'n of City of New York, Inc. v. City of New York*,
   40 N.Y.3d 417 (2023) ............................................................................................. 17

*Price v. Garland*, 45 F.4th 1059 (D.C. Cir. 2022) ........................................................... 56

*Project Veritas Action Fund v. Rollins*, 982 F.3d 813 (1st Cir. 2020) ............................. 55, 57

*Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295 (2d Cir. 1996). ................................. 11

*Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904 (2d Cir. 1990) ................................. 40

*Riley v. Cnty. of Broome*, 95 N.Y.2d 455 (2000) ........................................................... 58

*Rodney v. City of New York*, No. 22-cv-1445 (S.D.N.Y. 2023) .................................. 16, 25, 53

*Rogers v. New York City Transit Auth.*, 89 N.Y.2d 692 (1997) ......................................... 49

*Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124 (2d Cir. 2023) ....................................... 11

*State of New York v. Patricia II*, 6 NY3d 160 (2006) ...................................................... 51

*Tancredi v. Malfitano*, 567 F. Supp. 2d 506 (S.D.N.Y. 2008) .......................................... 60

*United States v. Ayala*, No. 22-cr-369, 2024 WL 132624 (M.D. Fla. Jan. 12, 2024) ............... 46

*United States v. Gori*, 230 F.3d 44 (2d Cir.2000) ........................................................... 60

*United States v. U.S. Gypsum Co.*, 333 U.S. 364 (1948) ................................................. 10

*Vans, Inc. v. MSCHF Prod. Studio, Inc.*, 88 F.4th 125 (2d Cir. 2023) ................................. 9

*Wells Fargo Advisors, LLC v. Sappington*, 884 F. 3d 392 (2d Cir. 2018) ............................. 41

*Wheelock v. Noonan*, 108 N.Y. 179 (1888) .................................................................... 46

## STATUTES

McKinney's Cons Laws of NY, Book 1, Statutes § 76 ......................................................... 52

N.Y Pub. Health L. §§ 2599-aa–bb ............................................................................... 47

N.Y. City Charter § 1041(4). ......................................................................................... 58

N.Y. Civ. Rts. L § 79-P(1)(b) ......................................................................................... 22

N.Y. Civ. Rts. L. § 79-P(2) ...................................................................................... 22, 44

N.Y. Pub. Off. L. §§ 84–90 ........................................................................................... 47

N.Y.C. Admin. Code §§ 10-181 ..................................................................................... 17

N.Y.C. Admin. Code §§ 14-189(b) ................................................................ 24, 44

N.Y.C. Admin. Code §§ 8-101 ........................................................................ 47

OTHER AUTHORITIES

Ashley Southall, *Video of Man Berating Officer Opens Debate Over Recording in Police Stations*, New York Times (Aug. 21, 2018) ............................................ 19

Chloé Cooper Jones, *Fearing for his Life*, The Verge (March 13, 2019, 10:00 AM) ............. 17

Committee Report of the Justice Division, Committee on Public Safety, Donovan Richards (June 9, 2020) ........................................................................ 55

Long Island Audit, *Auditors RETURNS To Record Inside of NYPD Precinct! Federal Court Appeals Rules On NYPD Injunction! (*March 19, 2024) ...................................... 34

Long Island Audit, *Federal Judge ORDERS NYPD To Stop Enforcing No Recording Policy & Remove Unlawful Signs!* (Nov. 3, 2023) .................................................. 37, 61

Long Island Audit, *NYPD Thugs Go HANDS ON Fast! Arrest Journalist For Recording! Federal Lawsuit Incoming!* (June 4. 2024) ................................................. 37

NYPD Administrative Guide Procedure 304-21(7) ................................................. 26

NYPD Legal Bulletin (July 2020) ................................................................ 26

Robert Klemko, "*Cop-watchers are now YouTube celebrities. They've changed how police work,*" Washington Post (Aug 9, 2023) ......................................................... 14

Sponsor Memo, S.B. No. S3253 (2019) ............................................................ 22

The Pulitzer Prizes, *The 2021 Pulitzer Prize Winner in Special Citations and Awards* ........... 21

Tina Moore, *NYPD bans civilians from recording video inside precincts*, NY Post (Aug. 18, 2018, 6:36 PM) ............................................................................ 19

Transcript of the Minutes of City Council Stated Meeting (Mar. 7, 2018) ....................... 57

Transcript of the Minutes of the New York City Council Committee on Public Safety (June 18, 2020) ......................................................................... 24

WNBC (NBC 4 New York), Brooklyn NY Precinct Joins in on 'Mannequin Challenge' Craze, (Nov. 15, 2016 12:23 PM) ............................................................. 27

## PRELIMINARY STATEMENT

Thirty years ago, it took a series of coincidences for George Holliday to be standing on his balcony at 12:45 a.m. with a Sony Camcorder while seven LAPD officers beat Rodney King across the street on Foothill Boulevard. But since the invention of video-equipped cell phones, recordings of police misconduct and violence has proliferated: from Eric Garner to Walter Scott to George Floyd, images of outrageous police abuse and even murder have been captured by ordinary people using a device most of us carry in our pocket every day.

During the same period, the NYPD has done everything it can to keep its officers from being recorded and held accountable. After the video of Eric Garner was released, the NYPD started to arrest individuals recording officers as a means of preventing embarrassment to the department. This resulted in a 2016 lawsuit, and a grudging agreement by the NYPD to respect the right to record. But when a civilian made an embarrassing video inside an NYPD precinct lobby in 2018, the department again acted swiftly to avoid bad press, claiming that a policy preventing

6

recording in NYPD "facilities" applied even to places open to the public twenty-four hours a day.

Fed up with the NYPD's long-term failure to respect the right to record, both the City Council and the State Legislature passed laws in 2020 establishing the right to record law enforcement officers engaged in official conduct. The sponsor of the City Council bill, current Public Advocate Jumaane Williams, has confirmed in a sworn declaration that overturning the NYPD's Trespass Policy was one of the explicit reasons he introduced the bill.

Plaintiff-Appellee SeanPaul Reyes honors the legacy of George Holliday and other copwatchers. As a nationally-acclaimed journalist with a following measured in the hundreds of thousands, Reyes investigates government agencies that fail to provide transparency. When he learned that the NYPD was arresting people for recording police activity so long as it happened in a precinct lobby, he went to investigate and was arrested. He was arrested again when he returned to another precinct with a copy of

the laws in his hand. He sought and obtained an injunction at the district court allowing him to continue his investigation.

This Court should affirm that injunction because Reyes has demonstrated 1) that he will suffer irreparable harm without it and 2) that he is likely to succeed on the merits of his claim. Reyes cannot exercise his right to record police officers without subjecting himself to the threat of arrest, a classic case of irreparable harm whether the right is protected by a statute or the constitution. And he is likely to succeed on the merits because the Trespass Policy leverages the trespass laws to eject people from property held open to the public for exercising a statutory right. This is at odds with controlling authority from New York State's highest court.

Throughout its brief, Defendant-Appellant the City of New York (the "City") argues that the NYPD should have the right to establish "rules governing conduct within government facilities." Dkt. 39.1 at 3. But the question of this appeal is not whether the NYPD could theoretically craft some rule that does not run afoul of the right to record. The only policy at issue in this case is the Trespass Policy: a complete and total ban on

8

recording in precinct lobbies, which are otherwise held open to the public. And that policy is at odds with the plain language of the RTRAs and binding caselaw.

## QUESTION PRESENTED

Do the New York State and New York City Right to Record Acts permit the government to enact a complete and total ban on recording police activity on government-owned property and to arrest those who do record on such property for trespassing?

## STANDARD OF REVIEW

This Court will only reverse a district court's decision to issue a preliminary injunction when the district court abuses its discretion. *Vans, Inc. v. MSCHF Prod. Studio, Inc.*, 88 F.4th 125, 135 (2d Cir. 2023). A district court abuses its discretion when it "bases its ruling on an incorrect legal standard or on a clearly erroneous assessment of the facts." *New York C.L. Union v. New York City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012), *quoting Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 348 (2d Cir.2003).

This Court therefore reviews "legal conclusions, such as the appropriate standard for relief, *de novo*." *New York ex rel. Schneiderman v.*

9

*Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015). And it reviews factual questions for clear error. A trial court's factual findings are only clearly erroneous if, upon review of "the entire evidence," this Court is "left with the definite and firm conviction that a mistake has been committed." *Otal Invs. Ltd. v. M/V CLARY*, 673 F.3d 108, 113 (2d Cir. 2012), *quoting United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). During that holistic review, the trial court's "assessment of witness credibility" is "entitled to special deference." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 666 (2d Cir. 2023) (cleaned up).

A preliminary injunction is proper when a party shows "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). A mandatory injunction, which "alters rather than maintains the status quo," is subject to a heightened legal standard and may only issue when the movant shows "a clear or substantial

likelihood of success." *New York C.L. Union v. New York City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012).

This court typically "will not consider an issue raised for the first time on appeal." *Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 140 (2d Cir. 2023), *quoting Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 302 (2d Cir. 1996). The court retains prudential discretion to entertain arguments first raised on appeal "where necessary to avoid a manifest injustice or where the argument presents a question of law and there is no need for additional fact-finding." *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 114 (2d Cir. 2005). Still, "the circumstances normally do not militate in favor of an exercise of discretion to address new arguments on appeal where those arguments were available to the parties below and they proffer no reason for their failure to raise the arguments below." *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133 (2d Cir. 2008), *quoting Allianz, 416* F.3d at 114.

## <u>SUMMARY OF ARGUMENT</u>

SeanPaul Reyes is a nationally-recognized reporter and advocate who cannot exercise rights granted by state and city law under threat of arrest.

He testified at the preliminary injunction hearing about his specific plans to continue to investigate the NYPD and the fact that he could not do so without being arrested. The threat of arrest is actual and imminent—Reyes has twice been arrested for trying to record in precinct lobbies. And his harm cannot be measured in money damages because the images he cannot record can never be brought back: even if he were to bring a false arrest claim the money damages would not be readily calculated.

Reyes will succeed on the merits because the government may not use trespass laws to eject people from spaces otherwise open to the public for exercising statutory rights. The City argues for the first time on appeal that the government possesses a common-law right to exclude people from its property that is limited only by the constitution but fails to discuss binding state-law authority. And the City's new legislative history argument cherry-picks testimony and defies the sworn statement of the Right to Record Act's sponsor.

Most importantly, The City frames the overall question backwards. Reyes need not demonstrate that the RTRAs allow people to record police

officers "literally everywhere," only that they do not permit a total and absolute bar on recording inside the otherwise-public lobbies of precincts (Doc. 39.1 at 41). For the City to prevail, it must do more than suggest that limiting recording in some circumstances may be legal: it must defend the rule that it has implemented, which subjects any person recording anything inside the public lobby of a precinct with ejection from the precinct or arrest for trespassing. This state law analysis is straightforward and supports exercising supplemental jurisdiction.

## FACTS

### Reyes's Nationally Recognized Journalism

SeanPaul Reyes, under the name "Long Island Audit," investigates compliance with the First Amendment and other guarantees of a free and transparent government (A114–15). His investigations have been viewed millions of times (A114). His work has brought transparency and accountability to law enforcement agencies across the country (A122–23). He has been invited by multiple police departments to conduct training on civilian encounters (A122–23). National media likewise recognizes the role that Reyes and other auditors have played in the ongoing campaign for

police accountability and transparency. According to the *Washington Post*, for example, Reyes is "arguably YouTube's most popular auditor" and, with others, has "changed how police work."[1]

Reyes's reporting style is simple. Based on tips from the hundreds of thousands of people who view his investigations, he identifies cities or agencies that have placed unlawful limits on the public's right to obtain public information (A116). He then seeks to obtain the prohibited information, recording himself in the process. Most often, the illegal rules that he challenges forbid recording, so the recordings he creates challenge the rule. He then edits and posts the resulting videos for public comment (A117). Through this process, Reyes has successfully exposed illegal policies at dozens of government agencies. (A114–16)

One of those exposés took place on April 6, 2023, when Reyes was arrested in the Sixty-First Precinct in Brooklyn, New York (the "061"). Reyes was in the 061 to test whether the NYPD would comply with the

---

[1] Robert Klemko, "*Cop-watchers are now YouTube celebrities. They've changed how police work*," Washington Post (Aug. 9, 2023).

First Amendment, the New York State Right to Record Act ("State RTRA"), and the New York City Right to Record Act ("City RTRA"). He had been made aware, a few months earlier, of an NYPD policy prohibiting recording in NYPD's public precinct lobbies (A119–20); *see* NYPD Administrative Guide at 304-21(7) (A50–51). That policy (the "Trespass Policy") authorizes the NYPD to use the criminal trespass statutes to arrest anyone who takes photographs, makes an audio recording, or makes a video recording in NYPD "Facilities," including the public lobbies of precincts (A50–51).

The Trespass Policy contains no exception for any type of recording or any type of NYPD facility. On paper, the Trespass Policy forbids parents from recording their children at a police athletic league ceremony, civilian facilitators from recording training sessions at the NYPD Academy, or news outlets from recording public press conferences in One Police Plaza. In practice, it is enforced almost exclusively against those who record inside the lobbies of NYPD stationhouses (A73). These are spaces where individuals interact with the NYPD in full view and earshot of other

15

members of the public, where the doors are open twenty-four hours a day, and which the NYPD treats as "public place[s] for purposes of public access" that are "generally held open to the public" (A73). The policy has resulted in arrests, sometimes violent, of people seeking to document their encounters with police, including Patricia Rodney, a 63-year-old grandmother who tried to record officers who had denied her request to file a report required by her insurance company. As soon as she pulled out her phone, the officers tackled her, fracturing her arm and sending her to the hospital. *See Rodney v. City of New York,* No. 22-cv-1445 (S.D.N.Y. 2023).

Reyes entered the 061 on April 6 to test whether the NYPD would follow its Trespass Policy, enacted by administrative fiat in 2018, or the Right to Record Acts, passed two years later by the City Council and the state legislature to codify the public's broad right to record law enforcement officers (A119–20). A brief history of the policy and the law provides helpful context to what happened next.

16

## The NYPD's Trespass Policy Was Enacted By Fiat In 2018 To Prevent Embarrassment

In 2013, Ramsey Orta recorded as Police Officer Daniel Pantaleo placed Eric Garner in a prohibited chokehold until he died on a public street corner in Staten Island after Garner was allegedly observed selling "loosie" cigarettes. Based on the power of that recording, PO Pantaleo was found guilty at an administrative trial,[2] and the use of chokeholds was banned by the New York City Council. *See* N.Y.C. Admin. Code §§ 10-181; *Police Benevolent Ass'n of City of New York, Inc. v. City of New York*, 40 N.Y.3d 417, 430 (2023). The NYPD responded by implementing a widespread but unwritten policy of arresting civilians who attempted to record police officers.[3] That policy was challenged in 2016 by Ruben An after he was arrested for recording police officers on a public sidewalk. *See An v. City of New York*, 16-cv-5381, 2017 WL 2376576 (S.D.N.Y. June 1, 2017).

---

[2] *See In re Police Officer Daniel Pantaleo*, NYPD Case No. 2018-19274.

[3] Mr. Orta has been arrested on multiple occasions since recording Garner's death and has alleged that he has been retaliated against for his recording. *See, e.g.*, Chloé Cooper Jones, *Fearing for his Life*, The Verge (March 13, 2019, 10:00 AM), https://www.theverge.com/2019/3/13/18253848/eric-garner-footage-ramsey-orta-police-brutality-killing-safety.

In 2018, the NYPD settled with An and committed to implementing a policy that permitted recording by the public (A40–43). It further confirmed it would train its officers on that policy (A41–42). The draft policy attached to the *An* stipulation, Patrol Guide Procedure (PG 203-29), confirmed that the public can record police engaged in police activity (A46–47). It did, however, contain a caveat, which reads:

> Members of the public are not allowed to photograph and/or record police activity within Department facilities. Members of the service may order any member of the public who is photographing or recording within Department facilities to stop such activity. If such person refuses to stop, then they should be ordered to leave the premises. If such person refuses to leave the premises, members of the service may take proper enforcement action under the trespass statutes (i.e., Penal Law section 140.05 and 140.10).

PG 203-29 (A47).

The new rule did not include a definition of department "facilities," but officers were trained on the policy as part of the *An* settlement. (A4 –42) A few months later, a civilian entered the public lobby of the 28th precinct in Manhattan and began recording his interaction. The desk sergeant, who presumably had been trained on the NYPD's new policy regarding what sort of "facilities" did and did not permit recording, did not arrest the man,

18

but allowed him to continue recording and eventually leave the precinct (A22).[4] When the man subsequently posted the video he had recorded online, the NYPD immediately circulated an internal memo and notified multiple press outlets that it was banning recording in precinct lobbies.[5]

The NYPD did not engage in the rulemaking process when it first enacted the Trespass Policy, nor when it decided, contrary to the opinion of an officer who had been trained in it, that the term "NYPD Facilities" extended to those areas open to the public twenty-four hours a day. Instead, it codified the complete and total ban on recording, subject to no tailoring or exception whatsoever, by an internal memo that was reiterated after the Right to Record Acts were codified (A70–75). In addition, the Department posted signs in precinct lobbies in bold red letters that read:

**MEMBERS OF THE PUBLIC
ARE PROHIBITED FROM
AUDIO VIDEO RECORDING**

---

[4] *See* Ashley Southall, *Video of Man Berating Officer Opens Debate Over Recording in Police Stations*, New York Times (Aug. 21, 2018) https://www.nytimes.com/2018/08/21/nyregion/recording-in-police-stations-new-york.html.

[5] *See* Tina Moore, *NYPD bans civilians from recording video inside precincts*, NY Post (Aug. 18, 2018, 6:36 PM), https://nypost.com/2018/08/18/nypd-bans-civilians-from-recording-video-inside-precincts/.

**OR PHOTOGRAPHING
INSIDE THIS FACILITY**

(Exhibit 1 at 0:37).[6] These signs cite no law, regulation, rule, or policy granting the NYPD the authority to prohibit and arrest people for recording in these public spaces.

When the Trespass Policy was first announced in 2018, Donovan Richards, then Chairman of the Public Safety Committee of the New York City Council, spoke about it with the *New York Times*. Richards "noted that the recording ban created a double standard in police stations," and that "he would raise the issue this fall, when his committee considers the Right to Record Act, which would prohibit police officers from interfering with efforts to record them."[7] He introduced the City RTRA that fall, and it was passed in June 2020, just after the state legislature passed the State RTRA.

**The Murder Of George Floyd And The Right To Record Acts**

On May 25, 2020, Darnella Frazier turned on her cell phone for over eight minutes on Police Officer Derek Chauvin as he strangled George

---

[6] *See* Dkt. 44.1 (granting leave to supplement record with two video exhibits entered at the preliminary injunction hearing).

[7] Ashley Southall, "Video of Man Berating Officer Opens Debate Over Recording in Police Stations," New York Times, August 21, 2018.

20

Floyd to death for allegedly passing a counterfeit twenty-dollar bill. Her video "spurred protests against police brutality around the world, highlighting the crucial role of citizens in journalists' quest for truth and justice."[8] The New York State Legislature and the New York City Council, like legislative bodies around the country, responded to the murder of George Floyd by passing packages of legislation meant to hold law enforcement agencies more accountable. Both the state and the city included legislation providing a private right of action for those who are arrested or prevented from recording police officers engaged in police activity.

On June 8, 2020, the New York State Assembly passed the State RTRA, which provides that "[a] person not under arrest or in the custody of a law enforcement official has the right to record law enforcement activity and to maintain custody and control of that recording and of any property or instruments used by that person to record law enforcement

---

[8] *See* The Pulitzer Prizes, *The 2021 Pulitzer Prize Winner in Special Citations and Awards* https://www.pulitzer.org/winners/darnella-frazier.

activities." N.Y. Civ. Rts. L. § 79-P(2). The law defines "law enforcement activity" as "any activity by an officer acting under color of law." *Id.* at § 79-P(1)(b) (emphasis added).

The State RTRA had originated in the State Senate in 2019 as the "Right to Monitor Act." That proposed legislation enacted a right to record police activity within the criminal law, and in his sponsor memo, Senator Parker noted that the law "allows for individuals in New York state with respect to both public and private property" to record law enforcement officers.[9]

On June 8, 2020, the New York State Assembly held a hearing where the members overwhelmingly voiced their support for a broadly-interpreted right to record. Assemblymember Ron Kim emphasized that the NYPD engages in "nonstop unwarranted surveillance of everyday people," and that recording officers was "some sense of empowerment."

---

[9] *See* Sponsor Memo, S.B. No. S3253 (2019).

*See* June 8, 2020 Assembly Debate Transcript for L. 2020, ch. 100, *Recording*

*Certain Law Enforcement* Activities ("Assembly Tr.") Dkt. 8.2 at 127. [10]

Assemblymember N. Nick Perry explained that the bill protected

"the right to monitor *to the greatest extent* as long as—so long as you do not

interfere with police activity." *Id.* at 112 (emphasis added).

Assemblymember Phil Ramos emphasized that for people of color

approached by the police, a cell phone can be a "life-saving device," and

confirmed that the bill "affirms that *absolute right* for people to take a

video." *Id.* at 123. Members understood they were restraining police forces

and providing this right specifically to hold officers accountable for

misconduct: Assemblymember Robert Rodriguez stated that "it's vital that

we keep this tool in place to uncover and to push forward." *Id.* at 130. And

when some members asked if a "buffer zone" could be established to

prohibit recording within eight or ten feet, Assemblymember Perry

---

[10] There is no legislative history in the joint appendix because Defendant did not raise an argument regarding legislative history below. *See* A105. Should this Court choose to consider Defendant's new argument regarding legislative history, Plaintiff respectfully requests that the history Defendant ignored be considered as well.

reiterated that the bar on physically interfering with officers "provides adequate protection." *Id.* at 108–09.

Likewise, on June 18, 2020, the New York City Council passed the City RTRA. That act provides that "A person may record police activities and maintain custody and control of any such recording and of any property or instruments used in such recording." N.Y.C. Admin. Code §§ 14-189(b). Two years after stating that the Right to Record Act would address the double standard set by the Trespass Policy, Chair Richards emphasized that the purpose of the law was to remove decision-making authority from the NYPD. On the day of passage, in the voting chamber, he urged his fellow councilmembers "to say that the NYPD cannot decide how we are going to police this city." *See* Transcript of the Minutes of the New York City Council Committee on Public Safety, June 18, 2020, at 7:8–11.

The lead sponsor of the City RTRA, current Public Advocate Jumaane Williams, submitted a sworn declaration in another case emphasizing that he knew about the Trespass Policy and that "I intended and expected that

passage of the RTRA would supersede the NYPD No Recording Policy and prohibit police officers from impeding recording in public spaces, including such spaces within police precincts." Declaration of Jumaane Williams, Doc. 55-1 ¶ 13; *Rodney v. City of New York*, 22-cv-1445 (S.D.N.Y. Nov. 1, 2022) Dkt. 14.2 at 85 ("Williams Decl."). The City's contention that the City RTRA could not have addressed the Trespass Policy because the RTRA was first written in 2016, *see* Dkt. 39.1 at 56, is nonsense. There was no reason to address the Trespass Policy in 2016 because in 2016 the NYPD had a *general* policy of arresting anyone who recorded anywhere. *See An*, 2017 WL 2376576, at *3–5. Once the NYPD instituted the Trespass Policy and the bill was re-introduced, its sponsor expected to supersede that policy. *See* Williams Decl. ¶ 13. The City did not discuss legislative history at the trial court and should not be permitted to avoid confronting this sworn statement by the bill's sponsor by raising the issue now. *See Nortel Networks*, 539 F.3d at 133.

When the City RTRA and State RTRA became law, the NYPD took no action to revise or tailor the Trespass Policy to comply with the new

25

statutes. Instead, it doubled down on the absolute nature of the Trespass

Policy by issuing first a Legal Bulletin and then an Administrative Guide

Procedure. *See* July 2020 NYPD Legal Bulletin (A70–75); NYPD

Administrative Guide Procedure 304-21(7) (A50–51). That provision

authorizes NYPD officers to arrest people who are recording inside NYPD

lobbies for trespassing, regardless of the circumstances leading to the

recording and despite the plain language of the City and State RTRAs.

### Reyes's April 6 Arrest

On April 6, 2023, Reyes turned on his camera and entered the 061 to

file a complaint against the Trespass Policy (A120–121). The precinct had

been remodeled in the past few years. In 2016, the 061 had posted on X

(then known as "Twitter") a video showing the large open lobby, and a

great deal of the interior of the precinct, as officers held poses while the

camera passed.[11] This was part of the "Mannequin Challenge," in which the

NYPD joined a viral video craze in an effort to make precincts appear

---

[11] *See* Exhibit 2 to the preliminary injunction hearing,
https://twitter.com/NYPD61Pct/status/798268540864303109.

welcoming and accessible spaces.[12] Since that time, most of the public lobby of the 061 has been closed off and only a small antechamber remains open to the public.

When Reyes entered this antechamber, there were civilians waiting in line to file their own complaints (Exhibit 1 at 0:22). These people saw that Reyes was recording them (as the NYPD was, through overhead cameras visible to the public). No one complained about Reyes's recording; other members of the public continued to wait their turn to do business at the public window (Exhibit 1 at 0:44 and 1:24). Within minutes, first PO Cucuzza, then Sergeant Kormichet, approached Reyes and told him to stop recording. Each officer directed Reyes to the sign on the wall and informed Reyes he would be arrested if he did not leave the precinct or stop recording (Exhibit 1 at 7:29). Reyes acknowledged the sign but asked for legal justification for the rule. Instead of providing one, the officers arrested him (Exhibit 1 at 8:24).

---

[12] *See* WNBC (NBC 4 New York), [Brooklyn NY Precinct Joins in on 'Mannequin Challenge' Craze](https://www.nbcnewyork.com/news/local/mannequin-challenge-nypd-61st-precinct-brooklyn/1620183/), (Nov. 15, 2016 12:23 PM) [https://www.nbcnewyork.com/news/local/mannequin-challenge-nypd-61st-precinct-brooklyn/1620183/](https://www.nbcnewyork.com/news/local/mannequin-challenge-nypd-61st-precinct-brooklyn/1620183/).

Reyes spent six hours in custody before he was released with a Desk Appearance Ticket (A54). The Kings County District Attorney wrote to the court to dismiss Reyes's charges on May 10, 2023 (A60).

On June 1, 2023, Reyes entered the Seventy Fifth Precinct ("075") with a printed copy of the State RTRA and the City RTRA seeking to exercise his right to record. He was forcibly removed from the precinct lobby and arrested for trespassing and Obstructing Governmental Administration when he tried to reenter (A122). The criminal charges against him were dismissed by Hon Germaine A. Auguste on January 30, 2024, who wrote that the complaint failed to allege that the orders to leave the precinct lobby "were lawful orders as contemplated by the Court in *People v. Leonard*." Decision and Order, *People v. Reyes*, CR019322-23KN, (Kings County, January 30, 2024.

### Reyes's Complaint And The Preliminary Injunction Hearing

Reyes served his complaint on July 24, 2023, stating claims under the First Amendment, the State RTRA, the City RTRA, and the Citywide Administrative Procedure Act ("CAPA") (A15–37). Seeking to continue his

28

investigation of the NYPD's unlawful policy, Reyes moved for a preliminary injunction to bar the NYPD's enforcement of the Trespass Policy during the pendency of this litigation (A86).

On September 28, 2023, the district court held an evidentiary hearing at which Reyes testified as to his plans to investigate the NYPD (A114–30). He testified about his arrest on April 6, his subsequent arrest on June 1, and his current predicament. He testified that he "received numerous tips on a weekly basis from people in the New York City area about police misconduct" (A122). He testified that he wanted to act on these tips and continue investigating and recording the NYPD, "but I can't do that. I can't do that because I will be arrested, just like I was there" (A122).

For his part, Captain Leone conceded that the security concerns in precincts can be easily remedied, and that the NYPD has the ability to protect civilians who seek privacy when communicating with the agency. As he confirmed, NYPD maintains an anonymous tip line for those who are concerned about privacy and security (A146). Victims of sexual assault do not need to go to a precinct to report because the department maintains

separate and newly-renovated facilities dedicated to creating a safe and welcoming environment to victims of sexual assault so that they "don't have to wait around in precincts" (A147). And when asked if the NYPD could accommodate someone who wanted privacy to make an in-person report at the precinct, Captain Leone stated "I'm sure they could" (A154).

And Leone admitted that some of the privacy concerns he raised are not related to recording in precinct lobbies. Confidential Informants, for example, do not typically contact the NYPD by entering the public lobby but by calling their handlers (A146). After all, if someone wanted to keep track of which potential informers were visiting the precinct, they could simply record those people going in the front door, as Captain Leone acknowledged (A147–48).

At the hearing, The City argued that the Trespass Policy passed First Amendment scrutiny under the traditional forum analysis applied to public expression, that it did not violate the City and State RTRAs because they protect no rights beyond the First Amendment, and that the Trespass

Policy was not a "Rule" under the Citywide Administrative Procedure Act sufficient to require notice and comment (A179–84).

**The Court's Order And Reyes's November 3 Video**

On November 2, 2023, the District Court enjoined the NYPD from using the trespass statutes to arrest people solely for exercising their right to record police activity in the public spaces of NYPD precincts. While the court stated that "based on the evidence currently presented and at this juncture" Reyes was not likely to succeed on his First Amendment claim (A102), it found that Reyes had established the preliminary injunction factors regarding his State and City RTRA claims.

The trial court found that Reyes's in-court testimony supported a "strong showing" of irreparable harm (A106). And it noted that regarding the RTRAs, "Defendant offers no opposition to Plaintiff's argument other than to claim that '[u]nder the First Amendment and as well as the State and City Right to Record Statutes, Plaintiff will not succeed on the merits.'" (A105). Noting that The City had likewise conceded that "the Right to Record Acts do not require a forum analysis," the District Court

31

emphasized that The City had failed to put forward an argument that the Trespass Policy—"which is an outright ban of all recording"—is superseded by the plain language of the Right to Record Acts (A105).

The district court therefore issued a limited injunction preventing the NYPD from using the criminal trespass statutes to eject people otherwise lawfully present in the public lobbies of precincts solely because they are recording police officers engaged in police activity (A108). The injunction affects only one provision of the NYPD Administrative Guide and then only in spaces held open to the public at all times.

The next day, Reyes promptly returned to the 075 Precinct with the court order in hand. The officers were polite and courteous; no other civilians complained of being recorded; no secret information was captured; no victims of sex crimes or confidential informants were prevented from communicating with the NYPD securely. Reyes was able to record the entire encounter without incident. He posted the video to his

YouTube channel, demonstrating that the NYPD can facilitate recording in precincts without compromising security.[13]

**The City's Emergency Motion Practice**

On November 3, 2023, Reyes consented to The City's request for a two-week stay, purportedly to implement the injunction. But less than a week later, when the Court ordered the NYPD to start informing officers that the stay would be expiring and they would have to abide by the injunction, the City sought an emergency stay pending appeal (Dkt. 8).

In the emergency stay motion, the City challenged Reyes's showing of irreparable harm and raised two arguments regarding likelihood of success that it had not raised at the trial court. First, it argued that the government could exclude people from public property for any reason by relying on the common law right to exclude (Dkt. 8 at 18–21) and second, it argued that the legislative history of the Right to Record Acts suggested

---

[13] That video was taken after the close of evidence in the hearing and is therefore not part of the record, but to the extent the Court finds it helpful to resolve the question of Plaintiff's credibility when stating he intended to go to additional precincts, it is available here: https://www.youtube.com/watch?v=KYMUGQO9Sck (last visited May 3, 2024).

that despite their broad language they meant only to codify the right under the First Amendment as it then existed (Dkt. 8 at 21–24).

On February 16, the City filed its opening brief in this appeal (Dkt. 39.1). In that brief, it added some nuance to the arguments it raised for the first time in the emergency motion: instead of claiming the full force of the common law right to exclude, it argued that the city has a "common-law proprietary right to control access to" its property that supersedes the Right to Record Acts, and alternately that "Legislative history confirms that the Right to Record Acts do not enshrine broader rights than the First Amendment inside government buildings" (Dkt. 39.1 at 44–50, 55–61).

The Court heard argument on the motion for a stay pending appeal on March 12. On March 15, this Court stayed the injunction except with regard to Reyes (Dkt. 48). Forty-eight hours later, Reyes recorded himself visiting the 105th precinct, again without incident.[14]

---

[14] *See* Long Island Audit, *Auditors RETURNS To Record Inside of NYPD Precinct! Federal Court Appeals Rules On NYPD Injunction! (*March 19, 2024)*,* https://www.youtube.com/watch?v=jyZeYlq_LYI&t=624s (last visited May 3, 2024).

## ARGUMENT

## I.   Reyes Will Be Irreparably Harmed Absent An Injunction

To satisfy the first prong of the preliminary injunction analysis, a plaintiff must demonstrate that without an injunction he will suffer irreparable harm: harm that is "actual and imminent and that cannot be remedied by an award of monetary damages." *Forest City Daly Housing, Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir.1999). Actual and imminent harm is harm that is "neither remote nor speculative" but which is likely to come to pass if an injunction does not issue. *Yang v. Kosinski*, 960 F.3d 119, 128 n.34 (2d Cir. 2020).

Harm may not be measured in money damages when the loss is "difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010). For example, while an ordinary employment discrimination case may not warrant an injunction because the financial losses can be calculated, a claim of retaliatory discharge carries risks that others will be deterred from filing complaints, and these risks "may be found to constitute irreparable injury." *Holt v. Cont'l Grp., Inc.*, 708 F.2d 87, 91 (2d

Cir. 1983); *see also Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010) (risk of potential adverse impact of internal affairs investigation supports a finding of irreparable harm). The principle that irreparable harm is presumed when the loss is constitutional flows directly from the fact that loss of rights cannot easily be measured in money damages. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

Denying public access to governmental information causes irreparable harm. *New York C.L. Union v. New York City Transit Auth.*, 684 F.3d 286, 294–95 (2d Cir. 2012). And while this principle has constitutional roots, the harm caused by denying access to information is irreparable even when the claim is statutory. *See Martinez v. Cuomo*, 459 F. Supp. 3d 517, 526 (S.D.N.Y. 2020) (denial of American Sign Language interpretation of government broadcasts causes irreparable harm in a case brought under the Americans with Disabilities Act).

### A.    Reyes's Harm is Actual and Imminent

Reyes testified that he plans to continue his investigation into the NYPD and that without an injunction he will be arrested (A122–23).

Indeed, after the April 3 incident and before filing this lawsuit, Reyes was arrested at the 075 while carrying copies of the State and City RTRAs (A122).[15] At each stage of this litigation, when a court order has secured his rights, he has exercised them. During the one day in November that the injunction was in place, he recorded himself filing a complaint at the 075 without incident.[16] And just forty-eight hours after this court denied the City's motion for a stay pending appeal regarding Reyes individually, he livestreamed his visit to the 105th Precinct in Queens.[17] Reyes's actions demonstrate that, as he testified, he plans to continue his investigation. His testimony that he fears being arrested if he continues to record without an injunction is borne out by the fact that he was, in fact, arrested for continuing when no injunction was in place. Like in *Mullins*, where this Court found an injunction prevented irreparable harm when one officer

---

[15] *See* Long Island Audit, *NYPD Thugs Go HANDS ON Fast! Arrest Journalist For Recording! Federal Lawsuit Incoming!* (June 4, 2024), https://www.youtube.com/watch?v=DoYDeBXlUKM (last visited May 3, 2024).

[16] *See,* Long Island Audit, *Federal Judge ORDERS NYPD To Stop Enforcing No Recording Policy & Remove Unlawful Signs!* (Nov. 3, 2023), https://www.youtube.com/watch?v=KYMUGQO9Sck (last visited May 3, 2024).

[17] *See* Long Island Audit, *Auditor RETURNS To Record*, (note 14, above).

testified "that he would 'absolutely' have 'concerns' if the injunction were lifted, and that he feared retribution from IAB," Reyes's testimony that he is prevented from exercising his rights under fear of arrest shows that his harm is actual and imminent. *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010).

As Reyes testified, the threat of arrest is the only thing that was preventing him from recording in precinct lobbies, describing a classic chilling effect (A122). And when a government rule deters people from exercising rights, that loss constitutes actual and imminent harm, whether of a constitutional nature or not. *See New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020) (upholding an injunction against a rule that "has already had a chilling effect on non-citizen use of public benefits").

## B.    Reyes's Harm Cannot be Remedied Through Money Damages

Reyes was harmed before the injunction was in place because he had not been able to continue his investigation of the NYPD. The moment the stay of the injunction was lifted, Reyes returned to an NYPD Precinct and

38

recorded himself filing a complaint. The loss that Reyes would suffer, were he denied the right to continue recording, cannot be measured in damages, because no value can be placed on a recording—the ability to capture a moment in real time and preserve it forever. Being denied the right to record means being denied the recording itself, and the value of a recording cannot be calculated, and certainly not in advance.

Many types of non-monetary harm qualify as irreparable. Loss of customer goodwill often satisfies the standard: it is not easy to calculate whether, or how many, customers may leave a business or whether they will return. *See Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 445 (2d Cir.1977). Allowing unfair competition in the pharmaceutical industry to continue constitutes irreparable harm. *New York  v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015); *see also Innoviant Pharmacy, Inc. v. Morganstern*, 390 F. Supp. 2d 179, 183 (N.D.N.Y. 2005) (issuing preliminary injunction based on state unfair competition claims).

And this Court long ago noted the unique nature of photographs when considering irreparable harm in a case that involved licensing images

for publication in international news outlets. *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908 (2d Cir. 1990). There, the district court had denied an injunction on the theory that all that was at issue was the loss of the financial value of the photographs, which could be calculated later. This Court reversed, noting that photographs are unique and that "[e]ach picture tells a story and carries a reminder of the truth contained in the old adage that weighs one picture against a thousand words." *Id.* at 908. Reyes cannot be compensated for losing the right to record officers, and the right to maintain those recordings themselves.

Finally, the City does not dispute that absent an injunction Reyes will be arrested if he records in precinct lobbies. And the damages for a claim of false imprisonment cannot be easily calculated and cannot be predicted in advance. *See generally Broughton v. State*, 37 N.Y.2d 451, 456 (1975) (setting forth various standards for calculating damages in false imprisonment and malicious prosecution cases, noting the different common-law origin of each tort and the different elements of each offense). Should Reyes decide to exercise his rights in the absence of an injunction, he will suffer unlawful

40

arrest and malicious prosecution and cannot foresee in advance what his damages will be.

The City's main point of contention regarding irreparable harm is its claim that Reyes did not sufficiently differentiate between constitutional and statutory irreparable harm in the briefing to the district court. (Dk t. 39.1 at 31–33). But this distinction was discussed at the oral argument after the evidentiary hearing on the preliminary injunction (A173). And in any case, this court is "free to affirm on any ground that finds support in the record." *Wells Fargo Advisors, LLC v. Sappington*, 884 F. 3d 392, 396 n.5 (2d Cir. 2018). The record shows that Reyes faces the actual and imminent denial of his right to public information, a right that cannot be quantified by money damages and therefore constitutes irreparable harm. *Martinez*, 459 F. Supp. 3d at 526.

## II.    <u>Reyes is Likely to Prevail on the Merits</u>

The City claims that the district court's ruling would permit "absurd outcomes" and suggests that Reyes seeks to record "literally everywhere" Dkt. 39.1 at 39–41. But this argument frames the problem backwards. Reyes

has not challenged any policy other than the Trespass Policy: a total, absolute ban on recording at any time in the lobbies and vestibules otherwise open to the public twenty-four hours a day (A144). Even if the City were right that "some form of line-drawing is required" to balance the interests it asserts against the statutory obligations to permit recording, it has made no effort to draw any line at all (Dkt. 39.1 at 41).

To affirm, this Court need not find that the Right to Record Acts prohibit the NYPD from putting any limits on recording, anywhere. If the NYPD wishes to implement some sort of restrictions based on its purported privacy concerns, it should pass a targeted rule pursuant to the Citywide Administrative Procedure Act ("CAPA"). If that rule presents "hard questions" about the limits of the Right to Record Acts, those questions can be addressed in the rulemaking process or ultimately considered by a state court.

Here, there is no difficult line-drawing task. This Court must uphold the injunction so long as it finds that the Right to Record Acts at least limit the City from authorizing officers to arrest *anyone* who records *anything* in

the otherwise public lobbies of NYPD precincts. And accepting the City's argument would allow the government to use the trespass laws to deny people from exercising a wide variety of rights on government property. Rejecting the City's argument does not require any delicate balancing of interests. After all, the question was resolved decades ago by the New York State Court of Appeals in *People v. Leonard*, 62 N.Y.2d 404, 411 (1984), a case that the City does not attempt to distinguish or even cite.

### A. The District Court Properly Interpreted the Plain Language of the Right to Record Act

When the plain language of a statute is "unambiguous, our inquiry begins with the statutory text, and ends there as well." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 127 (2018); *See also Kramer v. Phoenix Life Ins. Co.*, 15 N.Y.3d 539, 550 (2010) ("Where the language of a statute is clear and unambiguous, courts must give effect to its plain meaning.") (quoting *Matter of Crucible Materials Corp. v New York Power Auth.*, 13 N.Y.3d 223, 229 (2009)).

The City and State RTRAs clearly and unambiguously establish a right to record law enforcement officers. The State RTRA provides that "[a]

person not under arrest or in the custody of a law enforcement official has the right to record law enforcement activity and to maintain custody and control of that recording and of any property or instruments used by that person to record law enforcement activities." N.Y. Civ. Rts. L. § 79-P(2). The City RTRA states that "A person may record police activities and maintain custody and control of any such recording and of any property or instruments used in such recording." N.Y.C. Admin. Code §§ 14-189(b).

This clear language confirms that the Trespass Policy is illegal. As the New York Court of Appeals held in *People v. Leonard* nearly forty years ago, the government may not leverage the trespass law to eject a person from a space otherwise held open to the public for exercising a right, whether constitutional or statutory. 62 N.Y.2d 404 (1984). In *Leonard*, SUNY Binghamton had issued a "persona non grata" letter to a former student barring him from a campus that was otherwise open to the public. *Id.* at 407. When the former student was found on campus, he was arrested for trespassing and the government claimed that it could exercise its common-law rights to exclude him from the school for any reason or for no reason.

44

*Id.* at 410. The Court of Appeals reversed and set forth a principle specifically limiting the government's right to exclude: "a decision to exclude that is predicated on or impermissibly inhibits a constitutionally or a statutorily protected activity will not be lawful." *Id. at* 411.

Because the Trespass Policy specifically authorizes officers to make arrests for trespassing "predicated on" a statutorily protected activity, the district court should be affirmed. Abandoning the arguments it made at the district court, the City now urges this court to apply state common law to nuanced hypothetical rules that it could have passed but did not. As set forth below, the City's state law arguments raise more questions than they answer and needlessly complicate this Court's simple inquiry.

### B.  The Government Cannot Use the Common Law Right to Exclude to Deny People Statutory Rights

The City claims that the Right to Record Acts must be "harmonized with the background principles of property law applicable to municipalities," and that "few sticks in the bundle of property rights are more fundamental than the power to exclude." (Dkt. 39.1 at 45, *citing Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 (1982)). But

45

the common law right to exclude, important or not, is not one of the principles **applicable to municipalities**. Instead, it is exclusively one of the "rights of **private property**." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 436 (1982) (emphasis added); *see also People v. Graves*, 76 N.Y.2d 16, 20 (1990) (burglary of private residence); *Wheelock v. Noonan*, 108 N.Y. 179 (1888) (private gravel dispute).

The City sets forth a robust defense of the common right that private landowners hold to exclude others from their property before acknowledging that, whatever corollary right the government holds, it is "not absolute." Dkt. 39.1 at 47. The City acknowledges only that the principle must give way only to "Constitutional" limitations, and even then, only discusses the First Amendment forum analysis and its analogue under the New York State Constitution (Dkt. 39.1 at 47).[18] But the City cites

---

[18] The government-as-proprietor argument has been soundly rejected in other constitutional contexts. *See United States v. Ayala*, No. 8:22-cr-369, 2024 WL 132624, at *14 (M.D. Fla. Jan. 12, 2024) ("Would an indictment for failing to submit to a full body cavity search when showing up at the District of Columbia Department of Motor Vehicles to apply for a learner's permit pass Fourth Amendment muster? Or could the United States charge the adherent of a non-favored religion with trespass for entering government property without offending the Free Exercise or Establishment Clauses? I think not.")

no principle under which government property rights are "constrained" by the Constitution but not by state law (Dkt. 39.1 at 47). After all, state law provides broader protections than federal law in a number of contexts, including the right to obtain an abortion, N.Y Pub. Health L. §§ 2599-aa–bb, the right to public information, N.Y. Pub. Off. L. §§ 84–90, and the right to be free from discrimination based on one's status as a caregiver. *See* N.Y.C. Admin. Code §§ 8-101. The City sets forth no principle under which a government property owner could limit the right to record but not these other rights.

Instead, the City cobbles together a number of cases setting forth specific circumstances in which people have been found liable for trespassing on government property. But these cases do not stand for the principle that the government may exclude anyone from property otherwise held open to the public for exercising a state right. Quite the contrary, The City's cases demonstrate how reliably courts have applied the test set forth by the Court of Appeals in *People v. Leonard* almost forty years ago.

47

In *Leonard*, the Court of Appeals concluded that "[1] when the public enjoys broad license to utilize certain property, State trespass laws may not be enforced [2] solely to exclude persons from exercising First Amendment or other protected conduct [3] in a manner consistent with the use of the property." *People v. Leonard*, 62 N.Y.2d 404, 410 (1984).

Thus, those who break into New York City Housing Authority hallways can be arrested for trespassing because the public does not enjoy broad access to these apartment buildings. *People v. Barnes*, 26 N.Y.3d 986, 989 (2015). Nor is it surprising that the City of New York can compel hospitality vendors to comply with the terms of their license, even though the services were provided in a public park in Queens. *Hosp. Grp. of Am., Inc. v. Terrace on the Park, Inc.*, 92-cv-6814, 1993 WL 127209, at *4 (S.D.N.Y. Apr. 20, 1993). The public does not enjoy broad access to set up food service tents in the park to begin with.

When property is held open to the public, *Leonard* prohibits ejection for exercising rights but allows the government to eject those who fail to act "in a manner consistent with the use of the property." *Leonard*, 62 N.Y.2d at

410. Thus, a person may be ejected from an NYPD lobby when they irately demand to see someone who is not there, scream at officers, and act in a manner that suggested he "intended to bring harm to a Police Department employee or cause some other type of harm." *People v. Reape*, 22 Misc. 3d 615, 619 (2008). And a pre-*Leonard* case held that the government can eject people camping out in the hallways of public office buildings because otherwise these work environments would be subject to "the whim or caprice of every citizen." *People v. Martinez*, 43 Misc. 2d 94, 97 (Crim. Ct. 1964).

The one case cited by the City that rejected the test in *People v. Leonard* did so because it presented solely a First Amendment challenge subject to a forum analysis. *See Rogers v. New York City Transit Auth.*, 89 N.Y.2d 692, 701 (1997). There, the Court of Appeals found that the New York City Transit Authority's regulations against commercial activity on subway platforms applied even when the commercial activity—selling political pamphlets—enjoyed First Amendment protections. The court found that *Leonard* had

"no apt application" when a detailed regulatory framework could be analyzed under a familiar constitutional test. *Id.* at 702.

That is why a public university may bar from campus a stalker whose victim has reported him to campus security, *People v. Young Kahng*, 52 Misc. 3d 1, 6 (N.Y. App. Term. 2016), but it may not eject someone for distributing pro-vegan leaflets at the campus gate. *Hershey v. Goldstein*, 938 F. Supp. 2d 491, 516 (S.D.N.Y. 2013). And before ejecting a student group occupying an administration building, the government must show that the protesters are doing so "in such manner as to disrupt or interfere with normal functions." *Bd. of Higher Educ. of City of New York v. Students for Democratic Soc'y, Queensborough Cmty. Coll. Chapter*, 60 Misc. 2d 114, 121 (Sup. Ct. Queens Cty. 1969).

The City's cases show state courts applying well-established principles to unique factual situations. Under this analysis, sometimes the government shows it can eject a person from private property and sometimes it does not. *See* Decision and Order, *People v. Reyes*, CR019322-23KN, (Kings County, January 30, 2024) (Dkt. 32.1). But none of the City's

cases holds what they must for the City to prevail: that the government can declare by fiat that statutorily-protected activity is universally barred from locations otherwise open to the public. If the government is correct, then the MTA could eject people from recording police officers in the subway system under *Rogers*, NYCHA could eject anyone who attempts to record in the hallways of public housing pursuant *Barnes*, and CUNY and SUNY could forbid students from recording police officers on any of their campuses according to *Young Kahng*.

This Court should decline the City's invitation to craft a new and untested exception to binding Court of Appeals precedent and instead rely on *People v. Leonard* to uphold the district court's straightforward order.

**C.    The Right to Record Acts' Legislative Histories Indicate They Should be Read Broadly**

Given the fact that the language of both statutes is "clear and unambiguous" the Court must "give effect to its plain meaning" and uphold the injunction. *State of New York v. Patricia II*, 6 NY3d 160, 162 (2006). New York State law agrees that "[w]here words of a statute are free from ambiguity and express plainly, clearly and distinctly the legislative

intent, resort may not be had to other means of interpretation" McKinney's Cons. Laws of NY, Book 1, Statutes § 76.

But despite the texts' clarity, the City asks the Court to consider legislative history and then selectively quotes from that history to suggest that the RTRA was not meant to provide any rights beyond what were already provided by the First Amendment (Dkt. 39.1 at 57–59). While legislators did emphasize the First Amendment, no legislator suggested that the laws incorporated the forum analysis test that the City now urges.[19] Instead, as set forth above, state assemblymembers were adamant that they were creating an "absolute right" that would be applicable "to the greatest extent possible" Assembly Tr. 112–13.

The City makes much of the fact that Councilmember Richards stated publicly that he would address the Trespass Policy by passing the City RTRA, then did not introduce language specifically addressing the Trespass Policy (Dkt. 39.1 at 57-58). But this is wrong—Richards did not

---

[19] This position, too, is new since the preliminary injunction hearing. See A178–79 ("THE COURT: [W]here within the state and city right to record laws does it require a forum analysis? MR. MUSSO: It doesn't, your honor.")

need to add anything to the City RTRA because the "broadly worded" statute did not need additional language to eliminate the policy. Report and Recommendations, Doc. 148; *Rodney*, 22-cv-1445 at 12. Richardson fulfilled his promise by introducing the bill, which, as he stated, would address the double standard in precinct lobbies.

And finally, the City fails to address the sworn statement by the bill's sponsor, filed in federal court, confirming that he was aware that in 2018 the NYPD "defiantly issued an internal manual that prohibited the recording of police activity within the entirety of police stations, including areas open to the general public." Williams Decl. ¶ 9. As he confirmed, the City RTRA was needed to protect people's right to record "wherever they interacted with police" including "the public spaces of police stations." Williams Decl. ¶ 15.

The sworn statement by then-Council Member Jumaane Williams, the bill's sponsor, crystalizes the thought process of those who passed the RTRAs. They believed that the right to record police was guaranteed by the

First Amendment, but that the NYPD was misinterpreting the law to allow itself to limit that right. The RTRAs were meant to change that.

### D. If the Legislature Meant to Codify the First Amendment, it Meant to Embrace a Broad Interpretation of the First Amendment Right

If, despite the above evidence, the Court finds that the legislatures meant the Right to Record Acts only to duplicate already-existing constitutional protections, it must determine what the Legislature understood those protections to be at the time. And there is no evidence that the legislature understood the right to record police—even under the First Amendment—to be subject to forum analysis. Instead, in part because the right involved gathering and "dissemination of information," restrictions on it are always evaluated by a higher standard. (Williams Decl. at ¶ 5).

During debates on the City RTRA, the New York City Council Committee on Public Safety issued a legislative report collecting those cases establishing a First Amendment right to record law enforcement. These cases all found that regulations curtailing the right to record were

always subject to intermediate scrutiny, regardless of forum. *See*
Committee Report of the Justice Division, Committee on Public Safety,
(June 9, 2020) Dkt. 8.2 at 55 n. 11 (citing *Gericke v. Begin*, 753 F.3d 1, 9 (1st
Cir. 2014) (which held that the First Amendment right to record extends to
filming on a **highway shoulder**, which is not a public forum); *ACLU of
Illinios v. Alvarez*, 679 F.3d 583, 604-605 (7th Cir. 2012) (declining to engage
in forum analysis and justifying its application of intermediate scrutiny to a
general **eavesdropping statute** that prohibited the surreptitious filming of
law enforcement in both public and non-public forums); *see also Fields v.
City of Phila.*, 862 F.3d 353, 359-60 (3d Cir. 2017) (applying intermediate
scrutiny to recording at a **convention center**, a privately-owned space and
not a public forum).

  These are not isolated cases but reflect a nationwide trend to apply
intermediate scrutiny to regulations restricting recording law enforcement
at least in part because recording the police is a newsgathering, not an
expressive, right. *See, e.g., Project Veritas Action Fund v. Rollins*, 982 F.3d 813,
835 (1st Cir. 2020) (finding no compelling reason that forum analysis

applies to recording law enforcement carrying out their official duties because information gathering rights are subject to intermediate scrutiny*);* *Kelly v. Borough of Carlisle*, 622 F.3d 248, 262 (3d Cir. 2010) (affirming prior circuit cases in which it "declined to apply the speech forum doctrine" to cases "involving the First Amendment right to access information"); *Price v. Garland*, 45 F.4th 1059, 1071 (D.C. Cir. 2022), *cert. denied*, 143 S. Ct. 2432, 216 (2023) (reviewing this line of cases and noting that they "make no effort to determine whether the location of the recording is a public forum: Because prohibiting the recording of a public official performing a public duty on public property is unreasonable, the specific nature of the property is irrelevant"). While other circuit courts are divided on the constitutional question, the City cites to no evidence that the legislatures intended to enact the more restrictive of two constitutional tests.

The New York State Legislature and City Council were aware of these cases—the council cited them specifically in the legislative record. Therefore, to the extent that these bodies sought to incorporate a First Amendment standard into the Right to Record Acts, the standard they

would have sought to incorporate would be the standard reflected in the cases they cited, not the traditional forum doctrine applied to restrictions on speech and explicitly rejected by these cases. Should this Court determine, therefore, that the Right to Record Acts meant only to incorporate the First Amendment, it should apply the test set forth in *Project Veritas* and determine whether the outright bar on recording in precincts is sufficiently tailored to the interests that The City sets forth. *See Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 837 (1st Cir. 2020) ("[T]he statute's outright ban on such secret recording is not narrowly tailored to further the government's important interest in preventing interference with police doing their jobs and thereby protecting the public.").

Councilmember Williams's statement that the RTRA "doesn't create any new rights" supports this interpretation. Transcript of the Minutes of City Council Stated Meeting (Mar. 7, 2018) at 42. Williams was concerned that there were two things the NYPD was "abysmal" on: "[o]ne is transparency and one is accountability." *Id*. Williams understood the First Amendment right to protect the right to record "in public spaces"

including indoor spaces "held open to the general public." Williams Decl.

¶¶ 9–11. Whether that opinion is subsequently borne out by the judiciary

does not change the fact that the legislative history, read in connection with

"the history of the times" and "the circumstances surrounding the statute's

passage," suggests that any First Amendment right the Council sought to

codify was a broad one. *Riley v. Cnty. of Broome*, 95 N.Y.2d 455, 464 (2000).

### E. The NYPD Failed to Follow the Citywide Administrative Procedure Act so the Trespass Policy is Void

The district court did not consider Reyes's claim under the Citywide

Administrative Procedure Act ("CAPA") because the claim under the Right

to Record Acts was so straightforward (A105). Still, the CAPA claim is

instructive in setting forth the proper procedures available to the City to

address its purported concerns.

The New York City Charter requires municipal agencies to go

through a public process before enacting a "rule," defined as any policy

that prescribes "standards which, if violated, may result in a sanction or

penalty." N.Y. City Charter § 1041(4). Any rule enacted in violation of the

Citywide Administrative Procedure Act ("CAPA") is void and does not

58

have the "force and effect of law." *HC2, Inc. v. Delaney*, 510 F. Supp. 3d 86, 98 (S.D.N.Y. 2020).

The City does not contend that it followed the rulemaking process when enacting the Trespass Policy. At the Preliminary Injunction hearing, the City argued that the "formal rule-making process is not necessary" to enact a complete ban on recording in precinct lobbies under threat of arrest (A182). But if a policy prohibiting ownership of pet ferrets is a "rule," then the Trespass Policy is a "rule." *See 1700 York Associates v. Kaskel*, 701 N.Y.S.2d 233 (N.Y. Civ. Ct. 1999). It is a clear-cut prohibition which, if violated, results in a clear-cut sanction. While the district court did not discuss the CAPA claim, this Court may uphold the injunction on any evidence in the record, and the CAPA violation is as clear, if not clearer, as the Right to Record Act violations.

Moreover, CAPA itself shows a pathway for the City to address the concerns it claims require the Trespass Policy. The City could use the CAPA process to develop a rule that balances its concerns, public comment, and the legal opinion of the New York City Law Department.

59

The City may not flout CAPA and enact a rule by fiat in plain violation of municipal and state law and then pretend that striking down that rule would "raise hard questions" about the limits of the right to record (Dkt. 39.1 at 52). If the NYPD wants to pass a rule addressing particularized privacy concerns, CAPA provides a means for doing so.

## III.  Public Interest and the Balance of Equities Favor Plaintiff

The City claims that the balance of equities favors overturning the injunction because recording in precincts will intrude upon the public's "expectation of privacy inside the stationhouse" (Dkt. 39.1 at 62). To the extent that the expectation of privacy in the public lobby of a police precinct is relevant, a district court relying on Second Circuit cases analyzing other public lobbies has held that no expectation of privacy exists in a precinct lobby. *See Tancredi v. Malfitano*, 567 F. Supp. 2d 506, 511 (S.D.N.Y. 2008) (*citing United States v. Gori*, 230 F.3d 44, 46 (2d Cir.2000)). Courts, like the public and the NYPD, understand the difference between the public lobby and the private interior of a police precinct. And the

NYPD is perfectly well-equipped to allow recording in public lobbies and maintain privacy, as Captain Leone testified at the hearing (A147–54).

Reyes's subsequent visits to precincts have confirmed that the NYPD can overcome any privacy concerns in precinct lobbies. Each time a court has ordered the NYPD to comply with the law, its officers have been polite and friendly, and Reyes has been able to go to the precinct, do his business, and leave, while recording.[20] The NYPD is more than capable of managing the security concerns it speculates about in its briefing. Reyes's right to record law enforcement—guaranteed by statute—is in the public interest and favors an injunction.

The City claims that harm to the supposed privacy interests of non-parties tilts the equities against upholding the injunction. But the law does not suggest that third parties have an expectation of privacy in precinct lobbies to begin with and the City's own witness confirmed that the NYPD can supply privacy to those who need it.

---

[20] *See* Long Island Audit, *Federal Judge ORDERS NYPD To Stop Enforcing No Recording Policy & Remove Unlawful Signs*! (Nov. 3, 2023), https://www.youtube.com/watch?v=KYMUGQO9Sck

## IV.    The Court Properly Exercised Supplemental Jurisdiction

While the district court found that the record at the preliminary injunction hearing did not support issuing an injunction on the First Amendment claim, Reyes continues to litigate that claim at the trial court, along with a claim under the Fourth Amendment that the Trespass Policy constitutes a policy of false arrest. Because the state and municipal law claims are challenges to the same NYPD policy, the district court found that it was appropriate to exercise supplemental jurisdiction (A102-03).

In claiming that exercising supplemental jurisdiction was improper, the City makes the same mistake that it has made throughout its briefing: substituting hypothetical nuanced rules for the one that the NYPD actually enacted and actually used to arrest Reyes. The district court did not need to "wade[] into an unresolved issue of state law" to address whether the Trespass Policy is valid (Dkt. 39.1 at 51). As set forth repeatedly above, the Right to Record Acts establish rights, and it is well-settled under state law that the government cannot eject people from property otherwise held

62

open to the public for exercising rights protected by state law. *See Leonard,* 62 N.Y.2d 404.

The City, not Reyes, seeks to have this court needlessly consider potential complexities of state law by assuming it has passed a nuanced and thoughtful rule that presents a complicated balancing test. But it is not before the Court to consider whether a person could bring cellphones into prisons and courthouses, or if a rule tailored to protect the interests of those seeking privacy could be enacted. No rule but the Trespass Rule is at issue here and striking down that rule requires a straightforward application of clear precedent from the Court of Appeals.

## <u>CONCLUSION</u>

For the reasons stated above, the district court's preliminary injunction of November 3, 2023, as modified by the order of this Court on March 15, 2024, should be upheld.

Dated: May 10, 2024
New York, New York

Respectfully Submitted,
    */s/ Andrew Case* .

Andrew Case
Meena Roldán Oberdick
LatinoJustice PRLDEF
475 Riverside Drive
Suite 1901
New York New York
(212) 739-7506
acase@latinojustice.org

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief was prepared using Microsoft Word, and that according to the software for that program, it includes 11,648 words, not including the caption, the table of contents, the table of authorities, the signature blocks, or this certificate.

Andrew Case